1                     UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                           WESTERN DIVISION

4          THE HON. JUDGE GARY ALLEN FEESS, JUDGE PRESIDING

5

6    UNITED STATES OF AMERICA,          )
                                        )
7                      Plaintiff,       )
                                        )
8          vs.                          ) NO. 09-CR-1125-GAF
                                        )
9    AUGUSTUS BALTAZAR,                  )
                                        )
10                     Defendant.       )
     _____)

11

12

13

14                      JURY TRIAL - DAY 2

15                 (8:30 a.m. - 12:03 p.m. only)

16                     Los Angeles, California

17               Wednesday, September 1, 2010

18

19

20

21

22

23       LISA M. GONZALEZ, CSR 5920, CCRR - Official Reporter
                        Roybal Federal Building
24              255 East Temple Street, Room 181-C
                        Los Angeles, CA  90012
25                 (213) 621-7709; csrlisag@aol.com

```
 1   APPEARANCES:

 2   FOR THE GOVERNMENT:   ANDRÉ BIROTTE JR.
                           UNITED STATES ATTORNEY
 3                         BY:  AMANDA M. BETTINELLI
                           ASSISTANT UNITED STATES ATTORNEY
 4                         United States Courthouse
                           312 N. Spring Street
 5                         Los Angeles, California 90012
                           (213) 894-0470
 6
     FOR THE DEFENDANT:    SEAN K. KENNEDY
 7                         FEDERAL PUBLIC DEFENDER
                           By:  HUMBERTO DIAZ, DFPD
 8                         321 East Second Street
                           Los Angeles, California 90012
 9                         (213) 894-5308

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2              CHRONOLOGICAL INDEX OF WITNESSES

 3
                                                       VOIR
 4   GOVERNMENT'S
     WITNESS             DIRECT CROSS REDIRECT RECROSS DIRE VOL

 5   Alex Alarcon          5      9

 6   Roy Grant           15     26      29

 7   Joseph Klucar       31     33      37     38

 8

 9   DEFENDANT'S                                       VOIR
     WITNESS             DIRECT CROSS REDIRECT RECROSS DIRE VOL
10

11   Daniel Lombardi     47     67

12   Michael D. Caruso   68     78

13   Nicole Alberca      80

14   Alex Alarcon        88

15   Kimberly Harris     91    111

16

17

18                    Index of Exhibits

19   Government's Exhibits                       Received

20   47                                             19

21

22   Defendant's Exhibits                       Received

23   251                                            58

24   272                                           102

25   204                                           107
```

4

| | |
|---|---|
| 1 | **Los Angeles, California, Wednesday, September 1, 2010** |
| 2 | **8:30 a.m.** |
| 3 | **-oOo-** |
| 4 | THE COURT:  Okay.  We are back on the record with |
| 5 | all jurors present and in their seats.  Defendant present |
| 6 | with counsel.  Government counsel present. |
| 7 | We're in the government's case-in-chief. |
| 8 | Next witness, counsel. |
| 9 | MS. BETTINELLI:  Your Honor, if I may, as a first |
| 10 | housekeeping matter, the parties have stipulated to the |
| 11 | admission of Exhibit Number 26, which is the Federal |
| 12 | Aviation Administration certification of Amerijet |
| 13 | International as an air carrier. |
| 14 | THE COURT:  All right.  Is that in writing or the |
| 15 | parties just agreed to it? |
| 16 | MS. BETTINELLI:  We just agreed to it this |
| 17 | morning, Your Honor. |
| 18 | THE COURT:  All right.  Ladies and gentlemen, a |
| 19 | stipulation is an agreement between the parties with respect |
| 20 | to evidence.  In this case they've agreed that Exhibit 26 is |
| 21 | what it purports to be.  It's an air carrier certificate for |
| 22 | Amerijet International.  It will be received into evidence, |
| 23 | and you can establish and accept on the basis of the |
| 24 | stipulation that that fact is proved.  All right? |
| 25 | MS. BETTINELLI:  Yes.  And I will briefly publish. |

1    That's the document.

2              Now, the government calls, Your Honor, Alex

3    Alarcon.

4         **Alex Alarcon, Government's Witness, Sworn**

5              THE CLERK:  Please state your name, spelling your

6    last name for the record.

7              THE WITNESS:  My name is Alex Alarcon.  Last name

8    A-l-a-r-c-o-n.

9              THE COURT:  Go ahead, counsel.

10

11                    Direct Examination

12   BY MS. BETTINELLI:

13   Q    Good morning, Mr. Alarcon.

14   A    Good morning.

15   Q    Where are you currently employed?

16   A    I work for Amerijet.  I'm the warehouse manager.

17   Q    And where is your office located?

18   A    963 East 12th Street, Los Angeles, California, 90021.

19   Q    And how long have you been there?

20   A    Right now about seven years.

21   Q    And as warehouse manager, what are your duties or

22   responsibilities?

23   A     I receive all the merchandise from the customers; and

24   weight, make sure the weight is good; dimension, the box;

25   and label it.  And Fridays we load the trucks.

1  Q    Turning your attention to July 27, 2007, were you

2  working that day?

3  A    Yes.

4  Q    And were you working as a warehouse manager at that

5  time?

6  A    That's correct.

7  Q    And what did you do on that day?

8  A    What I am doing on that day?

9  Q    Right.  Were you working -- you said you had a number

10 of responsibilities.  Were you working in cargo or customer

11 service?  What were you doing on that day?

12 A    Working in the warehouse on cargo.

13 Q    And on that day did you have an opportunity to assist a

14 customer unloading a vehicle?

15 A    Yes.

16 Q    And what customer was that, if you know?

17 A    Well, I don't remember the customer, but I get all the

18 customers and working customers, regular customers.

19 Q    I understand.  Did you help in unloading something from

20 a vehicle?

21 A    Yes.

22 Q    And what did you unload?

23 A    Unload the -- well, Mr. John, my boss, he's the one

24 that called me for helping to load a safety machine, safety

25 box.

1   Q     A safety box?

2   A     Yeah.

3   Q     And I'm going to ask you to turn your attention to

4   what's been marked as government's Exhibit Number 10.

5   That's in the folders there to your right.

6   A     This one?

7   Q     Yes.

8   A     Okay.

9   Q     And if you have it before you, or just look up on the

10  monitor -- it's already been admitted into evidence if you

11  can't find it.  There's a monitor in front of you,

12  Mr. Alarcon, and it's also on your monitor.

13          Just for clarification of terminology, when you're

14  referring to a safety box, are you referring to a safe as

15  depicted in this photograph here?

16  A     Yes.  We receive a -- yeah.

17  Q     And then with respect to the assistance that you

18  provided to your boss, John Arcopian, what did you do with

19  respect to the safe?

20  A     Well, I help him to take it from the car.  And after

21  that we took them to the scale to see, to find out the

22  weight; and then I fill out the warehouse receipt where we

23  put the weight and the dimension of the box.  And then after

24  that we close it, close the box.

25  Q     So when you put the item on the scale -- and I believe

8

1  this is the scale that you're referring to; is that correct?

2  A    Yes.

3  Q    So the safe was weighed on that scale, and then did you

4  say that you packaged it?

5  A    Well, we put it in the original box --

6  Q    The original box?

7  A    -- because there was no box.  We put it in the original

8  box.  After that we close it, wrap it.

9  Q    And did you have an opportunity to speak with the

10 defendant at the time that the box was being wrapped?

11 A    No.

12 Q    And did you have an opportunity to speak with or see

13 who he was with when he came into the cargo -- the

14 warehouse?

15 A    Yes.  He was with my manager, my boss, John.  And I

16 heard that it was empty safe.

17 Q    Empty safe.

18 A    Sure.

19 Q    Let me just clarify.  So he was there coming into the

20 warehouse, and you went and assisted him with his safe, to

21 pack it; is that correct?

22 A    Yes.  I was next to him trying to put -- well, we put

23 it in the -- we put it in the original box and take it out,

24 and I heard that.

25 Q    And what did you hear?

9

1    A    I heard that it was an empty box.

2    Q    Who said that?

3    A    I think John asked the customer if it was an empty box,

4    and the customer say it's a empty box.

5    Q    An empty box.  And the box that you're referring to is

6    what you called a safety box?

7    A    Yeah.

8    Q    And that's a safe?

9    A    Yeah.

10   Q    Now, finally when the customer came in, was he with

11   anyone?  Was there anyone else in the vehicle when you

12   unloaded it?

13   A    No.  I don't remember.

14        MS. BETTINELLI:  No further questions, Your Honor.

15        THE COURT:  Cross-examine.

16

17                     Cross-Examination

18   BY MR. DIAZ:

19   Q    Mr. Alarcon, do you remember using a forklift truck to

20   move the safe in question?

21   A    Well, after we put them in the original box, I remember

22   that I tape it up; I wrap it up; we put them in the skid,

23   wood skid.  And then after that we weigh the box, the safety

24   box.

25   Q    But before that it was -- you did not use a forklift

1   truck?

2   A     No.  Me and John, we take them off from the car --

3   hands.

4   Q     Now, this is a photograph of the business where you

5   work at; right?

6   A     Sure.  Yeah.

7   Q     At the time that Mr. Baltazar showed up on that day, it

8   was towards the end of the day; correct?  It was in the late

9   afternoon?

10  A     I don't remember if it was -- well, probably it was in

11  the afternoon.

12  Q     And do you remember that there was a trailer truck

13  ready to leave your establishment, that it was being loaded?

14  A     No, I don't remember that there was a truck.

15  Q     Do you remember -- take a look at that picture in front

16  of you and tell me:  Where did Mr. Baltazar park the car you

17  said that contained the safe box?

18  A     I don't remember this car.  First, the black car is my

19  car.

20  Q     I know, but where in relationship to that picture was

21  Mr. Baltazar's car?

22  A     I do not remember.

23  Q     Do you remember the type of car that he was driving?

24  A     I think it was a small car, but I don't remember what

25  kind of car it was.

1  Q    And the safe was -- how heavy was it; do you remember?

2  A    Well, it was pretty heavy, because when I help my boss

3  to take them off from the car, it was a little heavy.  So

4  that's why we take them off from there.  He asked me for

5  help.

6  Q    You don't remember using a forklift truck to pull that

7  safe out of a BMW hatchback?

8  A    No.

9  Q    Do you remember if Mr. Baltazar was accompanied by a

10 woman when he was there?

11 A    I'm not remember.  I'm not remember.

12 Q    Now, if you pulled -- as you said, you pulled that safe

13 out of the back seat of the car.  Was anybody present in the

14 front seat as you were doing this?

15 A    No.  I didn't see nobody in the front seat.  I just

16 take out the box with John.  I remember that.  I took them

17 out, and then after that we take them to the scale.

18 Q    So if there had been somebody else in the company of

19 Mr. Baltazar, you would have seen this person; correct?

20 A    Excuse me?  Could you repeat again?

21 Q    If there had been anybody else in the company of

22 Mr. Baltazar, you would have seen this person; correct?

23 A    No.  I'm not sure.

24 Q    It's a very small establishment where you work at;

25 correct?  It's not a large place?

1   A     Well, it's big.  The warehouse is big.

2   Q     The front of the warehouse that we're looking at, that

3   picture, it's not very big; is it?

4   A     Well, are you talking about the door --

5   Q     Yes, the front.

6   A     -- or are you talking about the whole warehouse?

7   Q     I'm talking about the front of the warehouse where

8   people can come and park.

9   A     Well, yeah, it's pretty big.

10  Q     You can fit two or three cars in front of it?

11  A     No.  No.  No cars allowed in there.

12  Q     But if they could park in there, you could fit two or

13  three cars in front of your establishment; correct?  That's

14  the size of the establishment?

15  A     No.

16  Q     It's bigger?

17  A     For the car going inside and parking, it's too small.

18  You're talking about inside the warehouse, right, inside the

19  entrance?  That's what you're talking about?

20  Q     Let me switch here.

21  A     Probably I don't understand what you're trying to say.

22  Q     Now, there is a scale in your building; right?

23  A     Yes.

24  Q     Tell us where that scale is in relationship to that

25  picture.

1   A     It's in the middle of the warehouse.

2   Q     You have to go through that door that looks like a

3   large door, correct, to go in there?

4   A     No.

5   Q     How do you get to that scale?

6   A     Well, we take the box all the way to that scale.

7   Q     Okay.  And your testimony is that without using a

8   forklift truck, you and Mr. Arcopian took that safe and took

9   it all the way to the scale and put it on the scale to be

10  weighed; correct?

11  A     No.  We took them by hand to the scale, and then we put

12  them in the wood skid.  Then after that I drive the forklift

13  and put them in the scale.

14  Q     Okay.  Let me ask you again.  Your testimony is that

15  you and Mr. Arcopian took that safe by hand all the way to

16  the scale to be weighed; correct?

17  A     Yes.

18  Q     And at this point when you were doing this, there's

19  another person working in the establishment; correct?

20  A     No.  Only me and John.

21  Q     Nobody else was in there?

22  A     No.

23  Q     There was nobody else working on paperwork?

24  A     Well, that -- you're talking about the office

25  paperwork?

1  Q    I'm talking about the establishment, your

2  establishment, Amerijet.

3  A    Yeah, okay.  But if you're talking about the paperwork,

4  that's the office part.  I'm the warehouse.  There's two

5  different places.  After we finish doing the paper from the

6  customer outside the warehouse, they go inside the office.

7  It's different.

8  Q    So did you see Mr. Baltazar or anybody else go inside

9  the office?

10 A    Only Mr. Baltazar go inside the office.

11 Q    You didn't see anybody else?

12 A    No, I didn't see nobody else.

13 Q    Inside or outside; correct?  You don't remember anybody

14 else?

15 A    No, I don't remember nobody else.

16 Q    Now, you remember well what happened that day?

17 A    What happened that day?

18 Q    Yes.

19 A    No.

20 Q    Who works in the office doing the paperwork?

21 A    There's two girls working in there.  Mercy Miranda and

22 Mary Alarcon, too.

23 Q    You say Mary Alarcon.  Is she related to you?

24 A    Yes.  That's my wife.

25 Q    You remember the car that Mr. Baltazar was driving when

1    you said he had a --

2    A     No.  I don't remember the car.

3              MR. DIAZ:  Nothing further, Your Honor.

4              THE COURT:  Any redirect?

5              MS. BETTINELLI:  No, Your Honor.

6              THE COURT:  All right.  Thank you, Mr. Alarcon.

7    You may step down.

8              MR. DIAZ:  Your Honor, may I request that this

9    witness stay on recall?  I may need him.

10             THE COURT:  All right.  Mr. Alarcon, you're going

11   to be on call.  That means somebody may give you a call and

12   we'll have to have you come back.  I don't know, but you'll

13   be on call.

14             THE WITNESS:  Okay.

15             THE COURT:  Okay.  Thank you.

16             MS. BETTINELLI:  Your Honor, the government calls

17   Roy Grant.

18             **Roy Grant, Government's Witness, Sworn**

19             THE CLERK:  Please state your name, spelling your

20   last name for the record.

21             THE WITNESS:  My name is Roy Grant.

22

23                      Direct Examination

24   BY MS. BETTINELLI:

25   Q     Good morning, Mr. Grant.

1    A    Good morning.

2    Q    And where do you work?

3    A    I work at Amerijet Belize.

4    Q    And how long have you worked there?

5    A    Ten years.

6    Q    Now, where exactly is Belize located?

7    A    In Central America.

8    Q    And what is your position at the Amerijet Belize

9    facility?

10   A    Station manager.

11   Q    What are your duties and responsibilities as a station

12   manager?

13   A    To ensure all operation, documentation is in

14   compliance.

15   Q    Compliance with what?

16   A    With our standard operation procedures.

17   Q    And when you say standard and operation procedures, are

18   you located at an airport, or what is your facility?  Where

19   is it located?

20   A    We had a bonded warehouse situated on the airport

21   facility itself.

22   Q    And what is the name of the airport?

23   A    Philip S.W. Gold International Airport.

24   Q    Now, with respect to your training for handling

25   shipments, is there a certain procedure that you handle when

1  you have a cargo that's arriving by plane?

2  A    Yes, we do.

3  Q    And what is that procedure?

4  A    All cargo that arrive by plane we offload in the

5  restricted area.  We offload it on a ramp.  From the ramp we

6  take it directly to our bonded facility and we store it

7  until the following day.  And we break it down with the

8  supervision of the Belize customs, and we store it until the

9  consignee who is the owner of the cargo comes and pick it

10 up.

11 Q    Okay.  Now, turning your attention to the binders or

12 the folders that are there next to you, can you please look

13 at what's been previously marked as government's Exhibit

14 Number 47.

15 A    (Witness complies.)

16 Q    Do you have that before you?

17 A    Yes, ma'am.

18 Q    And what is it?

19 A    This is an official documentation from the Belize

20 customs that consignee or importer use in order to either

21 clear their item from our facility.

22 Q    And I want you to take a moment after you flip through

23 all of the materials in that folder that you have there, and

24 I just want to make sure so as we go through the

25 documentation and as I ask you questions, we can cover all

1    the documents that are there.  So take a moment to review

2    them, please.

3    A    (Witness complies.)

4    Q    Have you done so?

5    A    Yes, ma'am.

6    Q    Now, are these documents -- how do you recognize these

7    documents?  Are these documents that are maintained in your

8    facility?

9    A    Excuse me?

10   Q    Are these documents that are maintained in your

11   facility at Amerijet Belize?

12   A    Yeah.  We normally keep copies when customer comes and

13   finish with their clearance with the Belize customs.  We

14   will keep them as a form of record keeping in the event we

15   need to go back to see who actually comes and clear the item

16   and the method they use to clear the item.

17   Q    The method?  Is that what you said -- just to make sure

18   I understood you?

19   A    Yeah, because in Belize there are different type of

20   method of clearing items.  In this particular one that I see

21   here, this is an entry, Belize custom declaration form.  And

22   there are other methods.

23   Q    I understand.  Now, just with respect to your

24   responsibilities as a manager, all of the documents that

25   you've reviewed today, are they part of your regular

1    responsibilities that you would review them and keep them as

2    part of your record keeping responsibilities as the manager?

3    A    Yes, ma'am.

4         MS. BETTINELLI:  Your Honor, the government moves

5    to admit what's been previously identified as Government's

6    Exhibit Number 47.

7         THE COURT:  Any objection?

8         MR. DIAZ:  No, Your Honor.

9         THE COURT:  Received.

10        (Government's Exhibit Number 47 received)

11   BY MS. BETTINELLI:

12   Q    So with respect to the document that you were referring

13   to, what is the item that's referred to on this document

14   that you said has a method of clearing or making in customs

15   in Belize?

16   A    Okay.  On this document --

17   Q    I'll follow you.  Yes.  I'm on line 1.

18   A    All right.  On line 1 you will have the importer,

19   meaning whoever's going to pick up the item.  And also you

20   will have the -- whoever had sent the item.

21   Q    And that's line 2?

22   A    Yeah, that's line 2.

23   Q    And who was the person who sent the item?

24   A    A company, Elite Security.

25   Q    And what does this symbol over here mean?  What does

```
 1  that reference?

 2  A    That's our rotation number that the Belize customs give

 3  each file so they have it numerically.  And also it has the

 4  number, and it also has the date this file was submitted

 5  formally to Belize customs.

 6  Q    And finally, looking at item number 22 here, what is

 7  listed here?

 8  A    Okay.  Item 22 is the description of the item being

 9  officially declared by the consignee to the Belize customs

10  department, which is a one-piece metal safe.

11  Q    Now, turning your attention to -- there's another

12  document in your folder that I'm going to direct your

13  attention to which is the -- I believe it's referred to as

14  the out-of-charge note.  It may be number three, page 3.

15  A    Yeah.

16  Q    Do you have that before you?

17         Now, what does this document mean?  What is this

18  prepared for?

19  A    This document is prepared by the Belize customs, and

20  they get this information from our airway bill which clearly

21  states that the station that the document is being prepared

22  from is from the P.S. Gold Internatal Airport, which is

23  where we are; and the goods, the following goods, came in on

24  Amerijet on the date of arrival; and the airway bill number,

25  which is the document that Amerijet use for each item.
```

1    Q    I'm going to interrupt you briefly.  I'm sorry.

2    A    Sure.

3    Q    So when you say where we are, that's the airport in

4    Belize where you are?

5    A    Yes.  Sorry.

6    Q    That's okay.  I just want to be clear I'm reading the

7    writing here.  And then the goods were sent by Amerijet in

8    the United States?

9    A    Yes, ma'am.

10   Q    And with respect to the date, what is the date here?

11   A    The 31st of July, 2007.

12   Q    And when you were saying airway bill, you're referring

13   to this line with AWB BOL/AWB?

14   A    Yes, ma'am.

15   Q    And then finally this stamp here, what is that

16   referring to?

17   A    That's the same stamp that the Belize customs would

18   stamp on the documentation which has the same rotation

19   number as previously, and the date submitted.

20   Q    Just to clarify, is this the rotation number that

21   you're referring to?

22   A    Yes, ma'am.

23   Q    Okay.  Can you read that out, because I'm not clear

24   that I'm reading that well?

25   A    014051.

1   Q     And when a good arrives in Belize or in the airport,

2   for lack of better terminology, is this number that you just

3   referred to the identifying number for customs?  They use

4   one number all the time for this particular shipment?

5   A     Each shipment gets their own number.

6   Q     So the metal safe that is referred to here is always

7   going to be associated with this export number?

8   A     Yes, ma'am.

9   Q     And finally, once it's stamped, is this all the

10  paperwork that's prepared in connection with an

11  out-of-charge note?

12  A     Yes, ma'am.

13  Q     Now, finally I'm going to turn your attention to the

14  next document in your folder, which is the airway bill.  And

15  what I would like for you to advise, this is the stamp that

16  you were referring to, and this is the same customs stamp

17  that you were referring to in the previous document?

18  A     Yes, ma'am.

19  Q     The out-of-charge note.  And then with respect to the

20  signature here which is different on the handling

21  information, do you see that there where I'm pointing to?

22  A     Okay.

23  Q     Who completes that information?

24  A     The representative of Elite Security or the

25  representative of whoever comes to pick up the cargo.

1  Q    And what was the cargo that they were coming to pick up

2  here?

3  A    A metal safe.

4  Q    And what date did that safe arrive in Belize?

5  A    On the middle of the document you will see the flight

6  number, the flight information.  And at the bottom of it you

7  will see the date of arrival, which has M6, which is a code

8  for Amerijet.  The flight number 721001, that's the rotation

9  number for the aircraft; and the date, the 31st of

10  July 2007.

11  Q    And why is there a difference in that date and the

12  Belize customs date?

13  A    Because the freight came in on the 31st of July, and we

14  had -- we, meaning Belize Amerijet -- had notified the

15  consignee, which is the owner of the shipment in Belize,

16  that their freight came in.

17         For some reason, I'm not -- I don't know.  They

18  took that period of time to actually pick up the original

19  documentation.  Upon picking it up, that date stamp was the

20  official date the consignees submit to the Belize customs to

21  be -- to have the freight reexported back to the supplier.

22  Q    So in the time period from July 31st, 2007, when the

23  safe arrived in Belize through this time which is indicated

24  in the stamp that you referenced -- September 11th, 2007 --

25  where was the safe?

1    A    In Amerijet bonded warehouse.

2    Q    Now, when it's in a bonded warehouse, who has access to

3    that safe?

4    A    The Belize -- excuse me?

5    Q    If you said it's in your bonded warehouse, who has

6    access to it?  Who's able to look at it or open the safe

7    when it's there?

8    A    Okay.  Who have access to the warehouse is Amerijet

9    personnel, which would be me and one other person working in

10   the warehouse -- we have a pretty small staff, only four --

11   and the Belize customs.  Bonded warehouse meaning that when

12   the warehouse closes, I do not have full control of the

13   warehouse.  It's being shared between Amerijet and Belize

14   customs.

15   Q    Was this safe ever opened or moved by the Belize

16   customs?

17   A    No.  It wasn't opened.

18   Q    Now, I'm going to ask you to turn your attention to the

19   last document, which is a receipt.  Do you have that before

20   you?

21   A    Yes, ma'am.

22   Q    What is the purpose of this receipt?  Why is this made?

23   A    This receipt was made on the 7th of September, 2007, by

24   my office, indicating that Elite Security had paid air

25   freight charge for a safe under the airbill number mentioned

1  on the receipt to pick up the original documentation.

2  Q    And the airway bill number is what's on the line for

3  rent or for AWB?

4  A    Yes, ma'am.

5  Q    And so what are these charges generated for?  What is

6  the 974.76 dollars?  What is that for?

7  A    That is in Belize currency.  Belize is two to one for

8  the American dollar, and we charge that for services

9  provided by Amerijet to move cargo from point A to point B.

10 Q    Point A being the United States?

11 A    United States or wherever it's coming from to final

12 destination, which would be Belize.

13 Q    Now, finally, you mentioned that the safe was later

14 returned in September of 2007; is that correct?

15 A    Yes, ma'am.

16 Q    And it was returned to the United States?

17 A    Returned back to the sender in United States.

18 Q    Okay.  And it was returned from Elite Security in

19 Belize to?

20 A    Elite Security in Los Angeles.

21        MS. BETTINELLI:  Okay.  No further questions.

22        THE COURT:  Cross-examine.

23

24 ///

25 ///

Cross-Examination

BY MR. DIAZ:

Q    Mr. Grant, I believe you stated that you're in charge
of compliance with safety and operating procedures?

A    Yes, sir.

Q    Now, the examination of the safe contents, do they
belong to Amerijet or do they belong to customs in Belize?

A    Excuse me?

Q    The examination of the contents of the safe, that would
be a job that would be your job or would be a job that would
be the job of the customs?

A    Customs.

Q    And were you aware of what customs was doing regarding
this particular shipment?

A    Yes, sir.

Q    You were aware of the communications regarding the
contents of the safe; correct?

A    No, sir.

Q    Were you aware of the fact that customs in Belize knew
the contents of the safe?

A    No one -- as to my knowledge no one knew the contents
of the safe.  To my knowledge in Belize all that we knew
that it was, you know, metal safe sent in error by the
supplier to the consignee.  The verbal explanation was that
it was the wrong safe, so they had to do this documentation

1  with customs to reexport it back to the supplier.

2  Q    Were you -- your company was made aware of the fact

3  that there were contents inside that safe?

4  A    If my company was being aware after it was discovered

5  or --

6  Q    No.  At the time that it was sitting there in

7  your warehouse.

8  A    No, sir.  No, sir.

9  Q    Now, could I ask you to please take a look at Exhibit

10  216.

11  A    (Witness complies.)

12         MS. BETTINELLI:  Objection, Your Honor.  This goes

13  into the area of a motion in limine.

14         THE COURT:  Hold on.  He can ask him if he's seen

15  it.  It's not in evidence at this point.

16  BY MR. DIAZ:

17  Q    Mr. Grant, have you -- take a look at the second page

18  of that document.  Are you familiar with that type of

19  documents that are processed through your company in Belize?

20  A    I see the Belize customs stamp here on the side.

21  Q    Now, as part of your training and experience, when

22  Belize customs comes, they would make an itemization,

23  correct, of the goods coming in?

24  A    Excuse me?

25  Q    The customs agents would make an itemization.  They

1  would itemize the items coming into the country; correct?

2  A    When the customer comes and pick it up; right?

3  Q    Whenever they get declared with customs, customs needs

4  to make an itemization; correct?

5  A    Correct.

6  Q    That would be the normal operating procedure?

7  A    If the customer will pick up their cargo.  If they are

8  not going to pick it up and have it reexported back, there

9  will be no need for Belize customs to examine the freight

10  because it has already been declared by the shipper as per

11  shipper letter of instruction.

12  Q    Now, the safe that you had in question, it was a locked

13  safe; correct?

14  A    I can't recall how that safe looked.

15  Q    And do you have any particular concerns shipping locked

16  containers that you have no knowledge of what's inside?

17  A    No, sir.

18  Q    If somebody delivers a locked safe to Amerijet in

19  Belize, says ship this to the United States, there's no

20  problem for your company to ship it?

21  A    That's a different scenario.  You're talking about a

22  safe being tendered by a shipper to me to be exported to the

23  United States.  And by doing that, there's a different

24  procedure we do.

25  Q    You are operating under the presumption that that

1    container had been already examined?

2    A    That's right.

3              MR. DIAZ:  Nothing further, Your Honor.

4              THE COURT:  Anything further from the government?

5              MS. BETTINELLI:  Yes, Your Honor, just briefly.

6

7                         Redirect Examination

8    BY MS. BETTINELLI:

9    Q    When the safe arrived or the cargo arrived in Belize,

10   what did it look like?

11   A    A regular cargo.

12   Q    I'm going to turn your attention to the folders that

13   are next to you and what's been previously entered into

14   evidence as item number 8.

15             THE COURT:  Is this within the scope of

16   cross-examination, counsel, because it seems to me like this

17   is beyond?

18             MS. BETTINELLI:  Yes, Your Honor.  All I was

19   trying to establish --

20             THE COURT:  No.  First of all, you answered my

21   question.  Yes, it is.  And the second thing is, then, why

22   on redirect should I permit you to go into this since you

23   didn't go into it on direct?

24             MS. BETTINELLI:  Well, the offload and onload,

25   Your Honor, I was just merely establishing that it was a box

1    that he was examining and not a physical safe, to make that

2    distinction, Your Honor.

3            THE COURT:  Are you moving to reopen your direct

4    examination?

5            MS. BETTINELLI:  No, Your Honor.

6            THE COURT:  Well, then, I'm not going to let you

7    ask the question.  If you're moving to reopen, that's a

8    different thing.

9            MS. BETTINELLI:  Yes, Your Honor.

10   BY MS. BETTINELLI

11   Q    For purposes of the shipment, when you say -- when you

12   answered the question as to the proper procedures, the

13   procedure that's followed for regular freight being unloaded

14   from aircraft, that was followed in this case; correct?

15   A    Yes, ma'am.

16           MS. BETTINELLI:  No further questions.

17           THE COURT:  Any further cross?

18           MR. DIAZ:  No, Your Honor.

19           THE COURT:  All right.  You may step down.  Thank

20   you, sir.

21           THE WITNESS:  Thank you.

22           THE COURT:  Call your next witness.

23           MS. BETTINELLI:  Your Honor, the government calls

24   Jay Klucar.

25   ///

1   **Joseph Klucar, Government's Witness, Sworn**

2          THE CLERK:  Please state your name, spelling your

3   last name for the record.

4          THE WITNESS:  Joseph Scott Klucar, K-l-u-c-a-r.

5          THE COURT:  Go ahead.

6

7                     Direct Examination

8   BY MS. BETTINELLI:

9   Q    Good afternoon, Mr. Klucar.  Where are you currently

10  employed?

11  A    At Amerijet International.

12  Q    And which office are you employed in?

13  A    I actually work out of both offices -- a few days out

14  of our corporate offices in Fort Lauderdale and a few days

15  at our Miami operations office.

16  Q    And how long have you worked there?

17  A    It will be 20 years this month.

18  Q    And what are your responsibilities?  Actually, when, if

19  ever, did you hold a position as a cargo manager?

20  A    Several years ago.  I don't remember the exact dates

21  but about four years ago when I went in my current position.

22  Q    And what were your responsibilities?

23  A    I was in charge of the export operations at the Miami

24  hub.

25  Q    And in terms of export operations, would you be in

1    charge of policies and procedures with respect to handling

2    shipments?

3    A    Yes.

4    Q    And what, if any, procedures are in place in dealing

5    with hazardous materials?

6    A    The shipper is required to declare hazardous material.

7    And when they do, I have a special department that takes

8    over the acceptance of that cargo and checks it for all the

9    required packaging, quantities, and anything else that's

10   regulated by the hazmat regulations.

11   Q    And what sorts of goods are regulated by the hazmat?

12   And I'm using that term, that means hazardous materials?

13   A    Correct.

14   Q    What sorts of materials are regulated?

15   A    Anything that's dangerous:  For example, explosives,

16   corrosives, flammable liquids, flammable gases, toxins,

17   infectious substances -- anything that's dangerous.

18   Q    Excuse me.  Pursuant to your policy that you mentioned,

19   would ammunition qualify as an explosive?

20   A    Yes.

21   Q    And what procedure does Amerijet use with respect to

22   the disclosure of the contents of a cargo or a shipment?

23   A    Well, first, based on the declaration that the shipper

24   gives us, we determine exactly what class it is and what --

25   it's called a UN number.  It's specific to that particular

1    item.  And then the regulations tell us how it can be

2    packed, how much quantity we can have of it, and things like

3    that.

4    Q    And all that information is provided by the customer?

5    A    As to the exact nature of the goods, yes.

6    Q    And once that information is written down, does that

7    then trigger all of your policies and procedures?

8    A    Yes.

9            MS. BETTINELLI:  I have no further questions,

10   Your Honor.

11           THE COURT:  Cross-examine.

12

13                        Cross-Examination

14   BY MR. DIAZ:

15   Q    Mr. Klucar, I'm going to show you some documents that

16   are already in evidence from your company.  That's -- you're

17   familiar with that document; is that correct?

18   A    Yes, sir.

19   Q    Now, there's another document -- the first one that I

20   showed you is a letter of instruction; correct?

21   A    That's right.

22   Q    And another of the documents that you require is the

23   shipper's security endorsement; correct?

24   A    That's correct.

25   Q    Now, your company then requires that shipping or

34

```
 1   shipment be accompanied by these two documents; correct?

 2   A    That's right.

 3   Q    And your regulations indicate that these need to be

 4   completed properly?

 5   A    Yes.

 6   Q    And you rely on what's in those --

 7   A    Yes.

 8   Q    -- statements; correct?

 9            Now, let me show you again the letter of

10   instruction that you made some mention.  There's a

11   particular entry, correct, for whether or not there's a

12   hazard associated?

13   A    That's correct.

14   Q    Now, the answer should be a yes or a no; correct?

15   A    That's right.

16   Q    If it's not checked, it was not done properly; correct?

17   A    Pardon me?

18   Q    If there's no check, it's an improperly completed form;

19   correct?

20   A    I would say so.

21   Q    The same thing for all the items that are not checked;

22   correct?  Whether refrigeration is needed, you would want to

23   know?

24   A    That's correct.

25   Q    And whether you have something else, you would want to
```

1  know because you rely on this document; correct?

2  A    That's correct.

3  Q    And you rely on what the description is of the document

4  in order to find out what it is; correct?

5  A    That's correct.

6  Q    If it's an empty safe, you would expect something to

7  say "empty safe"; correct?

8  A    Not necessarily.  I would take a safe to be a safe.  I

9  would assume, I guess, that it was empty.

10  Q    Now, the other document that is associated with a

11  shipment is a security endorsement; correct?

12  A    That's correct.

13  Q    You are requesting that your customers tell you that

14  that particular shipment has no unauthorized explosives;

15  correct?

16  A    That's correct.

17  Q    And your company requires that whoever is making this

18  declaration provides proper document of who he or she is and

19  sign that document; correct?

20  A    That's correct.

21  Q    This is required for each shipment that you have;

22  correct?

23  A    Correct.

24  Q    This is the assurances that you receive that complete

25  reporting of whether or not an item is hazardous or not has

1   been done; correct?

2   A    Correct.

3   Q    Now, you mentioned that Amerijet considers ammunition

4   to be an explosive?

5   A    Yes.

6   Q    Are you aware of the fact that the federal regulations

7   do not consider ammunition to be explosives?

8   A    No, I am not.

9   Q    Your comment regarding explosives has to do with the

10  policies of Amerijet; correct?

11  A    And the IATA dangerous goods handling.

12          MR. DIAZ:  Nothing further, Your Honor.

13          THE COURT:  And the what dangerous goods handling?

14          THE WITNESS:  IATA.

15          THE COURT:  What's IATA?

16          THE WITNESS:  It's the International Air Transport

17  Association.  They publish a book we go by.

18          THE COURT:  IATA?

19          THE WITNESS:  Correct.

20          THE COURT:  Okay.

21          Anything further from the government?

22          MS. BETTINELLI:  Yes, Your Honor, briefly.

23

24  ///

25  ///

1

2                          Redirect Examination

3     BY MS. BETTINELLI:

4     Q    With respect to the nature of goods that are shipped,

5     all information provided on the shipper's letter of

6     instruction is provided by the customer; correct?

7     A    That's correct.

8     Q    And typically speaking, when a customer is completing

9     that information, they are obligated to disclose as much as

10    they know with respect to the content of their shipment; is

11    that correct?

12    A    That's correct.

13    Q    And it's Amerijet's policy to rely on the accuracy of

14    the information provided by their customer; is that correct?

15    A    Yes, ma'am.

16    Q    And finally with respect to line five on that document

17    that you were asked about, which I believe was the shipper's

18    letter of instruction, it asked about the hazmat materials.

19              I'll put that up for you.  I apologize.  Give me a

20    moment.

21              MR. DIAZ:  May I consult with counsel, Your Honor?

22              THE COURT:  Yes.

23                    (Counsel conferring)

24              MR. DIAZ:  Thank you, Your Honor.

25              THE COURT:  Go ahead.

```
 1   BY MS. BETTINELLI:

 2   Q     So you have that there.  I'm turning to the line with

 3   respect to the hazardous materials question, which I believe

 4   is down here.

 5   A     Uh-huh.

 6   Q     And if the shipper told, as in this particular case,

 7   the Amerijet employee that what was being shipped was an

 8   empty safe, would it be reasonable for that line to be

 9   blank?

10   A     Yes.

11              MS. BETTINELLI:  No further questions.

12              THE COURT:  Anything further, counsel?

13              MR. DIAZ:  Just briefly.

14

15                     Recross-Examination

16   BY MR. DIAZ:

17   Q     Sir, you're required that your paperwork be completed;

18   correct?

19   A     Yes.

20   Q     Particularly with items of safety?

21   A     Right.

22   Q     You don't want something to happen on a plane; do you?

23   A     No, sir.

24   Q     Now, if somebody delivers a locked safe and it's a

25   large safe similar to an item that is sitting right here to
```

1  my right, would you or your company ask to inspect that safe

2  before you load that safe?

3  A    Not necessarily.

4  Q    You would not be concerned whether or not there may be

5  explosives in that safe?

6  A    No, sir.

7  Q    You would not be concerned whether or not there may be

8  any items of contraband, like money?

9  A    No, sir.

10  Q    You would not be concerned whether or not there may be

11  items such as drugs or anything like that?

12  A    No, sir.

13  Q    Somebody could come to deliver that large safe to your

14  company and you would take it unopened and transport it

15  through the United States and overseas?

16  A    Well, I'd have to say at this point I can't see the

17  safe exactly, but there are certain packages --

18  Q    May I move it --

19            THE COURT:  Let him finish his answer first.

20            THE WITNESS:  There are certain packages that we

21  are required to open and inspect according to our TSA safety

22  regulations, but a safe would not be one of those items that

23  we're required to open.

24  BY MR. DIAZ:

25  Q    Do you need to take a better look at the safe in

1    question?

2    A    At this point, no.  Just knowing that it's a safe, I

3    know that we're not required to open it.

4    Q    No matter how large?

5    A    That's correct.

6    Q    Do you have an idea of whether or not your policies are

7    consistent with the policies of other carriers?  If anybody

8    was to take a package that large to an airline, would they

9    take it like that, unopened?

10   A    I believe so.

11            MR. DIAZ:  Nothing further, Your Honor.

12            THE COURT:  Anything further from the government?

13            MS. BETTINELLI:  No, Your Honor.  Thank you.

14            THE COURT:  All right.  You may step down.  Thank

15   you, sir.

16            MS. BETTINELLI:  Your Honor, may the government

17   have a moment to consult with counsel?

18            THE COURT:  Yes.

19                    (Counsel conferring)

20            MS. BETTINELLI:  Your Honor, the government rests.

21            THE COURT:  All right.  Are you ready to proceed?

22            MR. DIAZ:  Your Honor, if we could take a --

23            THE COURT:  Take a break?

24            MR. DIAZ:  -- short --

25            THE COURT:  Fifteen minutes?

1          MR. DIAZ:  Maybe a little longer, but 15 minutes

2    would be appreciated.

3          THE COURT:  Fifteen- to 20-minute break, ladies

4    and gentlemen.

5          We'll be in recess during the course -- for the

6    next 15 to 20 minutes.

7          I'll remind you during the course of the recess

8    that you should not discuss the case between or amongst

9    yourselves or with any other person or form or express any

10   opinions regarding the matters pending before this court.

11         We'll be in a 15- to 20-minute recess.

12               *(Recess taken at 9:40 a.m..;*

13                *proceedings resumed at 10:04 a.m.)*

14         THE COURT:  All right.  We're on the record

15   outside the presence of the jury.

16         Are you ready to start, Mr. Diaz?

17         MR. DIAZ:  We are, Your Honor.

18         May I make a Rule 29?

19         THE COURT:  Yes.

20         MR. DIAZ:  I'd submit on it.

21         THE COURT:  All right.  I think there's sufficient

22   evidence from which a jury could conclude that the elements

23   of the crime have been met; so I'll deny the Rule 29 motion

24   at this point.

25         MR. DIAZ:  Your Honor, one of the witnesses that I

```
 1    have -- it's Mr. Caruso -- I understand he's on his way
 2    here.
 3            THE COURT:  Okay.
 4            MR. DIAZ:  I want to call somebody else before him
 5    and hopefully by the time we get with Mr. Lombardi,
 6    Mr. Caruso will be here.
 7            THE COURT:  Are those the only two you're calling?
 8            MR. DIAZ:  No, Your Honor.  I am also going to be
 9    recalling Mr. Alarcon very briefly.
10            THE COURT:  Is he here?
11            MR. DIAZ:  He should be outside, Your Honor.  The
12    reason for that, Your Honor, may I say is I did not have the
13    safe here when Mr. Alarcon was here.
14            THE COURT:  You're going to be calling
15    Mr. Carruso, Lombardi, Alarcon --
16            MR. DIAZ:  I'm going to be calling Mr. Lombardi,
17    Mr. Caruso, Detective Alberca, or Lieutenant Alberca I'm not
18    sure what his title is, from the LAPD, Mr. Alex Alarcon, and
19    then possibly Mr. Baltazar's wife, and then some character
20    witnesses, Your Honor.
21            THE COURT:  Is Mr. Baltazar going to take the
22    stand?
23            MR. DIAZ:  It's a little premature to make that
24    determination, Your Honor.
25            THE COURT:  Premature?  Well, okay.  But it's soon
```

```
 1    not going to be premature --
 2              MR. DIAZ:  Of course.
 3              THE COURT:  -- so I guess we'll see.
 4              And then character witnesses -- how many character
 5    witnesses?
 6              MR. DIAZ:  Four, Your Honor.
 7              THE COURT:  All right.  Okay.  Are we ready, then?
 8              MS. OLIVER:  Your Honor --
 9              THE COURT:  Yes.
10              MS. OLIVER:  -- I would like to bring up the issue
11    that we raised before we selected the jury with respect to
12    Mr. Caruso on the scope of impeachment.
13              THE COURT:  Here's what we're going to do, first
14    of all, as I understand what Mr. Caruso is going to be
15    called for, Mr. Caruso is going to be called for certain
16    substantive issues relating to the authorization to seize at
17    the time of the return of the weapons; is that right?
18              MR. DIAZ:  That's correct.
19              THE COURT:  Given what you want to put him on the
20    stand for, is there going to be an attempt on your part to
21    introduce this impeaching material?
22              MR. DIAZ:  Yes, Your Honor.
23              THE COURT:  And if you want him to prove up
24    something, an element of your defense, what is the relevance
25    of impeachment?
```

1          MR. DIAZ:  Your Honor, it's not so much that I

2    want him to prove something, but I am going to be getting

3    into the -- I believe that Mr. Caruso is going to say that

4    he's the first person who actually took statements from

5    Mr. Baltazar --

6          THE COURT:  All right.

7          MR. DIAZ:  -- and was taken -- not so much getting

8    into what was taken but the documentation provided and what

9    else was exchanged between the two of them.

10          THE COURT:  Are those genuinely in issue?

11          MR. DIAZ:  I believe so, Your Honor.

12          THE COURT:  What is the issue?  What's the

13    dispute?  Tell me what's genuinely in issue because I'm not

14    certain that there's a proper basis or foundation for using

15    this other material, unless there really is a genuine

16    dispute.

17          MR. DIAZ:  Your Honor, there were communications

18    between Mr. Caruso and Mr. Lombardi regarding what

19    Mr. Baltazar did, and what he complied with.  I believe

20    Mr. Caruso is going to testify that Mr. Baltazar as far as

21    he knew complied or tried to comply with everything that had

22    to do with the export of the firearms.

23          I expect that Mr. Lombardi is going to be

24    disputing that.  I think that particularly the statements

25    then of Mr. Caruso stating that in his training, experience,

1   he has known the ICE personnel to not necessarily be

2   truthful in --

3           THE COURT:  All right.  I'm just going to have to

4   see how it plays out in terms of the examination.  What is

5   the impeaching material?  What do we have with respect to

6   impeachment?

7           MR. DIAZ:  There are two instances, Your Honor.

8   One is when Mr. Caruso received a suspension or reprimand

9   for having lied regarding damage to his vehicle while he was

10  at work, and the other one is the statements that he made to

11  the fellow prosecutor, the AUSA here, regarding what he

12  considers to be ICE procedures of not necessarily being

13  truthful and changing the record.

14          THE COURT:  That's in this case?

15          MR. DIAZ:  I think so, Your Honor.

16          MS. BETTINELLI:  That's correct, Your Honor.  And

17  then he was subsequently interviewed and said it was not his

18  belief that any dates or any information pertaining to this

19  case had been tainted in any way, shape, or form by ICE or

20  anyone, and that's memorialized in the second memo of

21  interview.

22          THE COURT:  All right.  It may be pertinent to

23  credibility, but I will remind you that under the rules you

24  can inquire into it, but we will not get into proving up

25  through collateral means --

46

```
1              MR. DIAZ:  I understand.

2              THE COURT:  -- the truth or the falsity of the

3    allegation, but I assume that Mr. Caruso is in a position

4    where he's going to have to acknowledge the problems.

5              THE COURT:  All right.  Let's proceed.

6              MS. OLIVER:  Thank you, Your Honor.  I just want

7    to then be precise.  The government agrees that those two

8    items that have just been mentioned with respect to

9    Mr. Caruso could develop to be appropriate impeachment.  The

10   government had produced other information, and it appears

11   that Mr. Diaz does not want to go into those areas of

12   impeachment, and I just want to put that on the record.

13             THE COURT:  Is that right, Mr. Diaz?   These are

14   the incidents that you're concerned about?

15             MR. DIAZ:  That's correct.

16             THE COURT:  All right.  Thank you.

17             Go ahead.  Bring the jurors in.

18                        (Jury in.)

19             THE COURT:  All right.  We're back on the record

20   with the jurors present.  All jurors present and in their

21   seats.

22             Ladies and gentlemen, as you heard before the

23   break, the prosecution has rested in its case-in-chief; so

24   that is the evidence that the prosecution is offering to

25   prove up its case.
```

1          The defendant has the option of presenting a case

2   or not presenting a case, I should say, and Mr. Diaz has

3   indicated that there will be witnesses presented in a

4   defense case.  Correct, Mr. Diaz?

5          MR. DIAZ:  That's correct, Your Honor.

6          THE COURT:  All right.  So we are going to proceed

7   with that now.  So call your first witness.

8

9                    D E F E N S E   C A S E

10

11         MR. DIAZ:  The defense calls Mr. Lombardi to the

12  stand, Your Honor, Daniel Lombardi.

13         THE COURT:  Okay.

14  **Daniel Lombardi, Defendant's Witness, Sworn**

15         THE CLERK:  Please state your name, spelling your

16  last name for the record.

17         THE WITNESS:  My name is Daniel Lombardi.  Last

18  name is spelled L-o-m-b-a-r-d-i.  First name Daniel.

19         THE COURT:  Go ahead, counsel.

20                   *Direct Examination*

21  BY MR. DIAZ:

22  Q    Mr. Lombardi, can you tell us how are you employed.

23  A    I'm a special agent with Immigration/Customs

24  Enforcement.

25  Q    How long have you been so employed?

1  A    Six years.

2  Q    You were involved in the investigation of a case

3  related to Mr. Baltazar; correct?

4  A    That's correct.

5  Q    The present case here?

6  A    Yes, sir.

7  Q    You were the case agent?

8  A    Yes.

9  Q    When were you first involved in this case?

10 A    Can you repeat the question?

11 Q    When was the first date that you got involved in this

12 case?

13 A    The first day I got involved in this case would have

14 been January, February of 2007.

15 Q    And you continued your involvement as the case agent

16 until when?

17 A    It would have been April of 2009.

18 Q    And --

19 A    Can I just clarify that the case -- I opened the

20 investigation in October -- October 18th, 2007.

21 Q    And what are the functions of a case agent?

22 A    The function of the case agent?  I investigate all the

23 facts, all the details of any investigation that I may be

24 involved in.

25 Q    Now, you had an opportunity to interview Mr. Baltazar

1    regarding this particular case, did you not?

2    A    Yes, sir.

3    Q    Now, here to my right there's a safe.  Can you see it?

4    Are you able to see it?

5    A    I did see it when I -- when it was coming in, yes.

6    Q    Do you remember that safe?

7    A    I remember a safe.  I'm not sure if that's -- a hundred

8    percent that that's the safe, but I remember a safe that

9    looked very similar to that.

10   Q    Now, when you met Mr. Baltazar, that was on the 18th of

11   October, you had already spoken with some of the federal

12   agents regarding the contents of the safe; correct?

13   A    That's correct.

14   Q    You had -- particularly you had spoken with Mr. Michael

15   Caruso; correct?

16   A    That's correct.

17   Q    Now, Mr. Michael Carruso was the person who first

18   opened the safe?

19   A    Yes, sir, I believe so.

20   Q    And you requested again a combination number from

21   Mr. Baltazar; correct, about -- for the safe?

22   A    Are you saying myself?

23   Q    Yes.

24   A    I don't remember specifically if I requested it.  I

25   believe CBP request that so they could open it up.

1    Q    Now, when you spoke with Mr. Baltazar, when you

2    interviewed him, you already knew that there were guns in

3    that safe; correct?

4              MS. BETTINELLI:  Objection, Your Honor.  Leading.

5              THE COURT:  Overruled.  Did you know that?

6              THE WITNESS:  Yes, sir.

7              THE COURT:  Okay.  Go ahead.

8    BY MR. DIAZ:

9    Q    And that information had been provided by Mr. Baltazar

10   to Mr. Caruso; correct?

11   A    I believe so.

12   Q    Now, Mr. Baltazar -- you called Mr. Baltazar on his

13   cell phone number -- correct? -- and asked to meet with him?

14   Do you remember that?

15   A    Yes, sir, I do.

16   Q    It's a cell phone number that you obtained by calling

17   his employer; correct?

18   A    His employer as in who --

19   Q    As the LAPD.

20   A    I don't believe that I got his phone number from the

21   LAPD.  I think it was just -- it would have been from

22   documentation that he had on file with CBP with the safe

23   that had been reimported back from Belize.

24   Q    Now, in that interview, Mr. Baltazar emphasized to you

25   that he was there as a private citizen and not as an LAPD

```
 1  officer; correct?
 2          MS. BETTINELLI:  Objection, Your Honor.  Calls for
 3  hearsay.
 4          THE COURT:  I don't think this question does.
 5          Actually, maybe it does.  Sustained.
 6  BY MR. DIAZ:
 7  Q    Did you review the paperwork that -- let me go back.
 8  I'm sorry.
 9          Your job was to ascertain whether or not there had
10  been a violation of the law; correct?
11  A    Yes, sir.
12  Q    And in connection with this, when you met with
13  Mr. Baltazar, he provided you with a large number of
14  documents; correct?
15  A    Yes, sir.
16  Q    Now, Mr. Baltazar came to meet with you in the company
17  of his wife; correct?
18  A    Yes, sir.
19  Q    And they both provided to you documentation regarding
20  this shipment; correct?
21  A    That's correct.
22  Q    Now, one of the documents that you were provided was
23  proof of where the guns in question had been purchased;
24  correct?
25  A    I believe so.
```

1  Q     And the guns, you learned, had been purchased at the

2  LAPD Revolver Vault?

3  A     That's correct.

4  Q     And you were also provided with information regarding

5  the ammunition, where the ammunition had been purchased;

6  correct?

7  A     I don't remember that specifically.

8  Q     Now, you had had an opportunity one of the times you

9  talked to Mr. Baltazar to ascertain from law enforcement

10 records if he had had frequent trips to outside of the

11 country; correct?

12 A     Yes, sir.

13 Q     And you had found out that he had been traveling

14 regularly to Belize; correct?

15 A     That's correct.

16 Q     And, in your mind, that was an area that you were

17 concerned why he was traveling to Belize so frequently?

18 A     In that regard, sure, I was concerned what the frequent

19 travel was outside the country to South America, yes.

20 Q     And you had an opportunity to ascertain what the

21 purposes of those trips were; correct?

22 A     At what point in time?

23 Q     At the point after you reviewed all the documents that

24 were provided to you by Mr. Baltazar and his wife.

25          MS. BETTINELLI:  Objection, Your Honor.  Again,

1  leading.

2          THE COURT:  Overruled.  It's a clarification and

3  foundational.  I'll allow it.

4          THE WITNESS:  Sir, can you repeat the question,

5  please.

6  BY MR. DIAZ:

7  Q    Yes.  You had an opportunity to find out the purposes

8  of Mr. Baltazar's travels to Belize; correct?

9  A    Through -- through interview with Mr. Baltazar?

10 Q    Documentation that you received.  You received

11 documentation, did you not, about a company in Belize called

12 Elite Security; correct?

13         MS. BETTINELLI:  Objection.  Leading.

14         THE COURT:  Overruled.

15         THE WITNESS:  At what point in time, sir?  Can you

16 repeat that one more time, please.

17 BY MR. DIAZ:

18 Q    At any point in time did you receive information of a

19 company in Belize called Elite Security?

20 A    Can you clarify that more, please.

21         MR. DIAZ:  Just one moment.

22 BY MR. DIAZ:

23 Q    Take a look at page 216 --

24         MR. DIAZ:  I'm sorry, Your Honor.

25 ///

54

```
 1   BY MR. DIAZ:

 2   Q    Exhibit 216.

 3   A    20216.

 4   Q    216.  Exhibit 216.

 5   A    There's no paperwork in 216.

 6            THE CLERK:  Judge, there's nothing in there.

 7            THE COURT:  Honest, I didn't take it.

 8            It was part of the examination earlier this

 9   morning.

10            MR. DIAZ:  I have an extra copy, Your Honor.

11            THE COURT:  I'll let him look at my book.

12   BY MR. DIAZ:

13   Q    Do you recognize Exhibit 216, Mr. Lombardi?

14   A    I do.

15   Q    Does it reflect communications and documents that

16   Mr. Baltazar was sending you?

17            MS. BETTINELLI:  Objection, Your Honor.  Again

18   gets into the area of the motion in limine.

19            THE COURT:  Overruled.

20            THE WITNESS:  It looks like, based on the facts,

21   it would have been -- it was on 10/19/2007.  It would have

22   been the day after I spoke with Mr. Baltazar at the LAX ICE

23   office; and it does look familiar, yes, sir.

24   BY MR. DIAZ:

25   Q    Take a look at Exhibit 234.
```

```
1    A     Hand me back the binder.

2               THE COURT:  Hand me back the binder.  Hopefully

3    234 is in your binder.

4    BY MR. DIAZ:

5    Q     Do you recognize that?

6    A     I do, yes, sir.

7    Q     Now, more documentation was provided to you regarding a

8    company called Elite Security in Belize; correct?

9    A     Yes, sir.

10   Q     And you had reviewed, before you spoke with

11   Mr. Baltazar, the documents regarding where and how the

12   firearms in question had been purchased; correct?

13   A     I had seen that documentation, yes, sir.

14   Q     There was, in your opinion as a case agent, nothing

15   improper or illegal about those purchases; correct?

16   A     The purchases, to my knowledge, they were legal, yes,

17   sir.

18   Q     The purchases indicate that somehow there was an intent

19   to conceal who the buyer had been at any time?

20   A     No, sir.

21   Q     Did you have an opportunity to find out what was the

22   intended purpose of these weapons?

23   A     Can you clarify that more for me, please.

24   Q     Did you have an an opportunity to find out what was the

25   intended use of these weapons?
```

1          MS. BETTINELLI:  Objection, Your Honor.  Calls for

2     speculation.

3          THE COURT:  Sustained.  Or, in the alternative,

4     hearsay.

5     BY MR. DIAZ:

6     Q    When you spoke with Mr. Baltazar and his wife, you

7     wanted to know if the requirements of the law had been

8     followed; correct?

9     A    Yes, sir.

10    Q    And you received information regarding efforts that had

11    been made to ascertain what the proper procedures were?

12         MS. BETTINELLI:  Objection, Your Honor.  Hearsay.

13         THE COURT:  I'm going to sustain it.  It's also

14    vague as to who he -- who you mean he got such information

15    from.  I'm assuming -- let me ask a question.

16         I'm assuming that in the course of your work in

17    your current capacity, you have training and experience as

18    to how things are properly exported from the United States

19    to other countries?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  All right.  So that's a given.  Are

22    you asking what he was told by Mr. Baltazar?

23         MR. DIAZ:  No, Your Honor.  I'm asking what he

24    found out regarding the documented efforts by Mr. Baltazar

25    and his wife to find out the requirements.

1          MS. BETTINELLI:  Your Honor, the objection would

2    be the same.  Hearsay.

3          THE COURT:  Sustained.

4    BY MR. DIAZ:

5    Q    Mr. Lombardi, you asked a number of questions of

6    Mr. Baltazar on that occasion; correct?

7    A    I did, yes, sir.

8    Q    He never declined to answer any of your questions?

9    A    No.

10   Q    And you continued to request additional documentation

11   regarding the subject matter of your investigation; correct?

12   A    That's correct.

13   Q    And he continued to provide you with additional

14   documentation?

15   A    That's correct.

16   Q    You had conversations also with the government or

17   officials from the government of Belize; correct?

18          MS. BETTINELLI:  Objection, Your Honor.

19          THE COURT:  Did he have conversations with -- you

20   can answer that question.  That's a yes or no.

21          THE WITNESS:  Yes.

22   BY MR. DIAZ:

23   Q    And those conversations were, in part, intended to see

24   whether there had been a violation of the law in taking the

25   guns to Belize; correct?

1        MS. BETTINELLI:  Objection, Your Honor.  That --

2        THE COURT:  Sustained.

3   BY MR. DIAZ:

4   Q    Let me take a look at -- I'm sorry.  Let me ask you to

5   take a look at Exhibit 251.

6   A    Okay.

7   Q    Do you see -- this is a document that Mr. Baltazar and

8   his wife provided to you, was it not?

9   A    Yes, sir.

10       MR. DIAZ:  Your Honor, I move 251 into evidence.

11       THE COURT:  Any objection to 251?

12       MS. BETTINELLI:  No, Your Honor.

13       THE COURT:  251 is received.

14           (*Defendant's Exhibit 251 received.*)

15  BY MR. DIAZ:

16  Q    Were you at all concerned in your investigation whether

17  or not the government of Belize had given -- had prohibited

18  entry of this safe into the country?

19       MS. BETTINELLI:  Objection, Your Honor.

20       THE COURT:  Was he concerned about that.

21  Sustained.

22       State of mind of the investigating agent is not

23  relevant, counsel.

24       MR. DIAZ:  Very well, Your Honor.

25  ///

1  BY MR. DIAZ:

2  Q    Mr. Lombardi, you spoke with Mr. Baltazar and his wife

3  at length; correct?

4  A    Yes.

5  Q    On that date when you interviewed him?

6  A    That's correct.

7  Q    It was a friendly conversation in general?

8  A    Yes.

9  Q    You didn't tell him he was being investigated for

10 anything; you just wanted information; correct?

11 A    The -- the -- I was investigating the detention and

12 there was a license determination done from the state

13 department based on the shipping of the firearms outside of

14 the country, and we had spoken about that.

15        THE COURT:  Did you tell him that that's the focus

16 of your questioning of him, that that's why you were there?

17        THE WITNESS:  I believe we did on -- on a general

18 basis, yes, sir.

19        THE COURT:  Go ahead, Mr. Diaz.

20 BY MR. DIAZ:

21 Q    Mr. Lombardi, you did not record that conversation;

22 correct?

23 A    That's correct.

24 Q    That's your policy, the policy of your agency; correct?

25 A    You know I think, well, my agency, they do record

1  conversations such as with people, that's correct; but I

2  didn't do it on this day, no, sir.

3  Q     So it's not against the policy of your agent to not

4  record?

5  A     I'm sorry.  Can you repeat the question?

6  Q     Is it against policy of your department to record

7  conversations of interview?

8  A     Is it against policy?

9  Q     Yes.

10 A     No, sir.

11 Q     You just chose not to do it?

12 A     At the time I did not do it, that's correct.

13 Q     Now, you had a conversation later on with somebody from

14 the LAPD, a Nicole Alberca; correct?

15 A     That's correct.

16 Q     And you informed her that your conversations could not

17 be recorded because that was the policy of your department;

18 correct?

19 A     I don't remember if I said that, but it was not

20 something that I had seen before, seen agents do before, as

21 far as recording; so I hadn't done that.

22 Q     Now, take a look at Exhibit 233.

23 A     Okay.

24 Q     Do you recognize 233?

25 A     Yes, sir, I do.

1  Q    It's a communication between Mr. Caruso and yourself;
2  correct?
3  A    That's correct.
4  Q    Regarding whether or not there had been any export
5  violations; correct?
6  A    That's correct.
7  Q    And the determination was that there had been no such
8  violation?
9  A    Can you repeat the question, sir?
10  Q    The determination was that Mr. Baltazar had done
11  everything he could to comply with the export regulations;
12  correct?
13           MS. BETTINELLI:  Objection, Your Honor.  Counsel
14  is testifying for the witness.
15           THE COURT:  Counsel, he has an adverse witness on
16  the stand, and he is allowed to ask leading questions of
17  this witness.  That's all that is.  And that's a yes or no
18  question.
19           He's got the document in front of him, he can be
20  interrogated about it; so your objection is overruled.  The
21  witness can answer the question.
22           THE WITNESS:  Sir, can you repeat the question
23  again, sir?
24  BY MR. DIAZ:
25  Q    A determination was reached, was it not, between

1    Mr. Caruso and yourself that Mr. Baltazar had done

2    everything he could possibly do to comply with the export

3    laws?

4    A    That's what Mr. Baltazar said in the interview on the

5    previous day, on the 18th.

6    Q    Now, did you -- you found out that there were two types

7    of guns inside that safe; correct?

8    A    That's correct.

9    Q    9mm and .40 caliber?

10   A    That's correct.

11   Q    Now, as a fellow agent, do the laws of the

12   United States treat those guns differently that you know?

13   A    Not that I'm aware of.

14   Q    And do you know whether or not the laws of Belize treat

15   them differently?

16          MS. BETTINELLI:  Objection, Your Honor.

17          THE COURT:  Sustained.  Irrelevant.

18   BY MR. DIAZ:

19   Q    Did you have an opportunity to ascertain, not through

20   Baltazar but through other means, why the guns were returned

21   to the United States?

22   A    I'm sorry.  Can you repeat the question, sir.

23   Q    Did you have an opportunity to ascertain why the guns

24   were returned to the United States?

25   A    Yes.

1   Q    And what was the reason for that?

2   A    The country of Belize would not allow a caliber greater

3   than 9mm to enter the country.  It was contrary to their

4   laws.

5   Q    9mm were okay but not the .40 caliber?

6   A    Yes.

7            THE COURT:  Counsel.

8            MS. BETTINELLI:  I had an objection, Your Honor.

9   Again, I feel that this is in the area of the motion in

10  limine.

11           THE COURT:  Overruled.

12  BY MR. DIAZ:

13  Q    Now, as part of your investigation, Mr. Lombardi, you

14  also had an opportunity to interview an individual by the

15  name of John Akopyan; correct?

16  A    Yes.

17  Q    And you prepared a report as to what Mr. Akopyan said;

18  correct?

19  A    Yes.

20  Q    And Mr. Akopyan explained to you what the requirements

21  of his company were for exporting guns; correct?

22           MS. BETTINELLI:  Objection --

23           (A radio sounded in the courtroom.)

24           THE COURT:  What was that?

25           MS. BETTINELLI:  -- hearsay.  Objection.

```
 1              THE COURT:  Sustained.

 2              You can be more specific if you're going to

 3    impeach, but you can't just generally inquire into --

 4              MR. DIAZ:  I understand, Your Honor.

 5    BY MR. DIAZ:

 6    Q    Did you issue also a subpoena for further production of

 7    records from Mr. Baltazar's company?

 8    A    Yes.

 9    Q    And that subpoena was complied with?

10    A    Yes.

11    Q    Now, you had, immediately after you spoke with

12    Mr. Baltazar, you called his employer; correct, the LAPD?

13    A    We did have a conversation.  I believe it was prior to

14    the interview on the 18th.

15    Q    You had a conversation with the LAPD?

16    A    Yes.

17    Q    And you continued those communications with the LAPD;

18    correct?

19    A    We did continue communication, yes.

20    Q    In particular, you continued to have frequent

21    communications with Nicole Alberca?

22    A    That's correct.

23    Q    And you were aware that Ms. Alberca was conducting a

24    parallel investigation through her employer, the LAPD;

25    correct?
```

```
1   A    Yes.
2   Q    And Ms. Alberca was sharing with you what information
3   she was obtaining from her own investigation; correct?
4   A    Can you clarify the question, please.
5   Q    Ms. Alberca was sharing with you the information that
6   she was obtaining through her parallel investigation on this
7   case; correct?
8            MS. BETTINELLI:  Objection.  Relevance.
9            THE COURT:  Sustained.
10           MR. DIAZ:  Your Honor, may we be heard briefly at
11  sidebar?
12           THE COURT:  No, not a matter for trial.
13  Sustained.
14  BY MR. DIAZ:
15  Q    The contacts with Ms. Alberca were frequent; correct?
16  Whenever something happened to her, you would -- she would
17  immediately contact you back?
18  A    I wouldn't say they -- I wouldn't say they were as
19  frequent.  We had spoken, and there was -- there was lots of
20  time in between our communications because we both had
21  other -- other investigations that we were doing.
22  Q    You also had an opportunity to ascertain that
23  Ms. Alberca was herself trying to find out the law
24  underlying the regulations on this case; correct?
25           MS. BETTINELLI:  Objection.
```

```
 1              THE COURT:  Ground?

 2              MS. BETTINELLI:  Relevance, Your Honor.

 3              THE COURT:  Sustained.

 4  BY MR. DIAZ:

 5  Q    You learned from Ms. Alberca that she herself had

 6  spoken and interviewed Mr. Baltazar, did you not?

 7              MS. BETTINELLI:  Objection.

 8              THE COURT:  Sustained.

 9              Counsel, this is just not relevant to the issues

10  that the jury's got to decide.

11              MR. DIAZ:  Just one moment, Your Honor.

12              (Counsel conferred with his client.)

13  BY MR. DIAZ:

14  Q    Mr. Lombardi, you told Mr. Akopyan, did you not, that

15  Mr. Baltazar had complied with all the paperwork required?

16              MS. BETTINELLI:  Objection, Your Honor.

17              THE COURT:  Did he tell Mr. Akopyan -- overruled.

18  Did you say that to Mr. Akopyan?

19              THE WITNESS:  Can you repeat the question, sir,

20  and clarify, please.

21  BY MR. DIAZ:

22  Q    Did you tell Mr. Akopyan that Mr. Baltazar had complied

23  with all the requirements needed of the paperwork?

24  A    For -- for --

25  Q    For shipping the safe with the guns.
```

1  A    Did I tell Mr. Akopyan that he -- Mr. Baltazar was in

2  compliance with all the paperwork in shipping the safe with

3  the guns?

4  Q    Yes.

5  A    I don't believe I would have told him that, no, sir.

6  Q    If Mr. Akopyan said that much to the LAPD, would

7  Mr. Akopyan then be lying about that?

8            MS. BETTINELLI:  Objection.

9            THE COURT:  Counsel, Ninth Circuit has recently

10  spoken on that kind of a question.  You can't ask that kind

11  of a question about whether somebody else is lying,

12  especially if what you're talking about is something that's

13  not before the jury; so it's sustained on multiple grounds.

14            MR. DIAZ:  Nothing further, Your Honor.

15            THE COURT:  Redirect.

16                    *Redirect Examination*

17  BY MS. BETTINELLI:

18  Q    Mr. Lombardi, were you present on July 27th, 2007, when

19  the defendant completed the paperwork at Amerijet for the

20  shipment?

21  A    No.

22            MS. BETTINELLI:  No further questions, Your Honor.

23            THE COURT:  All right.  You may step down, sir.

24  Thank you.

25            All right.  Call, your next witness.

68

1          MR. DIAZ:  The defense calls Michael Caruso to the

2     stand, Your Honor.

3          **Michael D. Caruso, Defendant's Witness, Sworn**

4          THE CLERK:  Please state your name, spelling your

5     last name for the record.

6          THE WITNESS:  Michael D. Caruso, C-a-r-u-s-o.

7          THE COURT:  Go ahead, counsel.

8                    *Direct Examination*

9     BY MR. DIAZ:

10    Q    Mr. Caruso, can you tell us how you are employed.

11    A    I'm a United States Customs and Border Protection

12    Officer Department of Homeland Security.

13    Q    How long have you been so employed?

14    A    Twenty-one years, including with the legacy U.S.

15    Customs.

16    Q    Were you involved in the investigation and seizure of a

17    safe in this case?

18    A    I am not sure if the safe was seized.

19    Q    Okay.  Were you involved in the seizure of the contents

20    of the safe?

21    A     It is my understanding that the contents were seized,

22    yes.

23    Q    Were you the first person who spoke with Mr. Baltazar

24    regarding the contents of that safe?

25    A    Please define first person, sir.

1    Q    When was the first time -- let me go back.  When was

2    the first time that you saw Mr. Baltazar?

3    A    I'm not sure if I ever actually met Mr. Baltazar.

4    Q    You remember speaking with Mr. Baltazar?

5    A    Yes, I do, sir.

6    Q    You remember Mr. Baltazar providing you the combination

7    lock?

8              MS. BETTINELLI:  Objection.

9              THE COURT:  Ground.

10             MS. BETTINELLI:  Hearsay, Your Honor.

11             THE COURT:  Overruled.

12             THE WITNESS:  I do not recall for sure if it was

13   Mr. Baltazar himself who provided the combination but that

14   does make sense.

15   BY MR. DIAZ:

16   Q    Besides Mr. Baltazar, are you aware of anybody who had

17   that combination?

18   A    It may be possible that the warehouse where the safe

19   was located provided me the combination.

20   Q    Now, you reviewed the paperwork associated with that

21   shipment; correct?

22   A    Approximately two or three months ago, yes, sir.

23   Q    Two or three months ago, you said?

24   A    Yes, sir.

25   Q    No, I'm talking about at the time of your investigation

70

1   of this case.

2   A    Oh, yes, sir.

3   Q    You attempted to ascertain whether or not it was, the

4   shipment was in violation of the regulations of your

5   department; correct?

6   A    I did do that, yes.

7   Q    And one of those was determining whether or not there

8   was a violation of the export laws of the United States;

9   correct?

10  A    Yes, sir.

11  Q    And you received documentation from Mr. Baltazar

12  regarding the contents of that safe and the travels of that

13  safe, did you not?

14  A    I'm sorry.  The contents and --

15  Q    And the itinerary, the travel.

16  A    Yes, sir.

17  Q    At the time that you were working on this case, you --

18  who was your supervisor?  Was it Mr. Chappel?

19  A    I believe that is correct.

20  Q    Now, let me ask you to take a look at Exhibit 244.  It

21  should be before you.

22       Do you recognize this exhibit, Mr. Caruso?

23  A    May I have a couple more moments, please.

24       Yes, sir.

25  Q    Is that a checklist related to this case?

```
 1   A     No, sir.

 2   Q     I'm curious.  Is that your own handwriting?

 3   A     Yes, sir.

 4   Q     Something that you prepared?

 5   A     Yes, sir.

 6   Q     Now, at one point in September, unknown date, you spoke

 7   with your supervisor regarding what was -- what the

 8   requirements were and whether or not there was a violation

 9   of the law; correct?

10   A     September, unknown date.  I'm sorry.  You're speaking

11   of the two dates that have question marks by them, sir?

12   Q     Yes; something in September where it says -- it lists

13   your supervisor Chappel; correct?

14   A     Yes, sir.

15   Q     You talked with Mr. Chappel, you wanted to find out if

16   the laws had been broken; correct?

17   A     I'm sorry.  Please repeat the question.

18   Q     You were trying to ascertain with the help of your

19   supervisors to determine whether or not the laws had been

20   broken?

21   A     Yes, sir.

22   Q     And you then requested and obtained from Mr. Baltazar

23   documents -- correct? -- regarding the shipment and

24   regarding that case; isn't that correct?

25   A     I'm sorry.  Could you please repeat the question?
```

1   Q     You obtained documentations from Mr. Baltazar regarding

2   the contents and everything else that was related to that

3   safe?

4   A     I obtained from Baltazar, yes, sir, the information

5   regarding the contents of the safe; yes, sir.

6   Q     Do you remember if Mr. Baltazar provided to you

7   documentation of where the firearms had been acquired?

8   A     Some of them, perhaps all of them, yes, sir.

9   Q     I'm sorry.  I did not understand.

10  A     Certainly for some of them.  Not certainly.  I believe

11  that for some of them, perhaps for all of them, he provided

12  documentation of where the firearms were acquired.

13  Q     Do you remember if he provided to you the documentation

14  regarding the -- where the ammunition had been purchased?

15  A     I do not recall if that was provided or not.

16  Q     Do you recall if any other documentation pertaining to

17  the guns or the ammunition was provided by Mr. Baltazar to

18  you?

19  A     At this time I do not recall what other documentation

20  was provided by Mr. Baltazar.

21  Q     And you did not keep a record of whatever documentation

22  Mr. Baltazar might have provided you, I take it?

23  A     I did attempt to keep a record.

24  Q     Can you please take a look at Exhibit 232.

25        Do you recognize Exhibit 232, Mr. Caruso?

```
1   A    Yes, sir.

2   Q    Is that a request that you generated yourself?

3   A    I believe that is correct.

4   Q    This was after you had obtained the combination for the

5   safe; correct?

6   A    I don't know if it was before receiving the

7   combination.

8   Q    The request already describes ten pistols, does it not,

9   Mr. Caruso?

10  A    Yes, it does.

11  Q    That information --

12  A    I believe so.

13  Q    -- must have been obtained after the safe was itself

14  opened, was it not?

15  A    I don't know if it was after the safe was opened.

16  Q    Do you remember if you were the first law enforcement

17  officer to open that safe or not?

18  A    I do not remember if I was the first law enforcement

19  officer to open the safe.

20  Q    Do you know if there's any record of anybody opening

21  that safe first?

22  A    I do not know if there's a record.

23  Q    Do you know if there was anything done or said to that

24  person who first opened that safe?

25  A    I do not know.
```

1   Q    Now, taking a look again at Exhibit 232 that you have

2   before you, after you ascertained and found out that there

3   were guns in there, you still needed to make a determination

4   whether or not requirements had been met; correct?

5   A    May I have a moment to read --

6   Q    Yes.

7   A     -- narrative?

8         Thank you.

9   Q    And the answer to my question?

10  A    Would you please repeat the question, sir.

11  Q    You -- after you discovered, reviewed the contents of

12  the safe, you requested help in determining whether or not

13  the requirements had been met for the safe to come in;

14  correct?

15  A    Yes, sir.

16  Q    You made that request to somebody in headquarters, in

17  Washington D.C.; correct?

18  A    Yes, sir.

19  Q    This was after you had consulted with your supervisor;

20  correct?

21  A    Yes, sir.

22  Q    Because you were not sure as to whether or not there

23  were requirements that had been met; correct?

24  A    No, sir.

25  Q    You already knew about that when you made that request?

1    A    I'm sorry.

2    Q    Did you know the requirements had been met when you

3    made that request?

4    A    It's one of those double-negative questions that is

5    difficult to know how to answer.

6    Q    Okay.  Let me ask you to take a look at the last two

7    lines on the first page on that exhibit.  You were sending

8    this request to an expert and your request was this form's

9    required -- correct? -- for the export of these ten pistols?

10   A    Yes, the forms are required.

11   Q    You did not know whether or not those were required,

12   that's why you were asking the help of somebody else;

13   correct?

14   A    No, sir.

15   Q    Is that question -- what it says:  Was a DSP-5 or

16   DSP-73 required; you already knew the answer to that

17   question?

18   A    Yes, sir.

19   Q    You just were asking this expert to give you the

20   information just to --

21   A    Because it's required for our procedures to get the

22   concurrence from the appropriate agency that our

23   understanding of the violation of law is valid.

24   Q    And if you knew the answer, the answer is that

25   Mr. Baltazar had complied with everything he had to do;

1    correct?  That's what you told Mr. Lombardi in the email?

2              MS. BETTINELLI:  Objection.

3              THE COURT:  Overruled.  Well, actually it's

4    compound.  There's a problem with the question.  I'll

5    sustain it on that ground.

6              Break it up, counsel so that we understand what

7    his answer relates to.

8    BY MR. DIAZ:

9    Q    Mr. Caruso, you said that you knew the answer to that

10   question?

11   A    Yes, sir.

12             THE COURT:  Hold off.  Let's get the question

13   again.

14             The question is:  Was a DSP-5 or a DSP-73 required

15   for the export of the ten pistols; right?  That's the

16   question.

17             THE WITNESS:  Yes, sir.  Okay.

18             THE COURT:  You felt you knew the answer to that?

19             THE WITNESS:  Yes, sir.

20             THE COURT:  But you're saying, your testimony, as

21   I understand it, is that procedure, nonetheless, required

22   you to make a written inquiry from someone within an

23   appropriate agency; is that right?

24             THE WITNESS:  Yes, sir.

25             THE COURT:  All right.  Now, when you said you

1  knew the answer to the question, was your understanding that

2  no license was required under the circumstances that were

3  presented to you by Mr. Baltazar?

4             THE WITNESS:  I would disagree with that

5  assumption.

6             THE COURT:  Okay.  Go ahead, Mr. Diaz.

7  BY MR. DIAZ:

8  Q    So when you advised Mr. Lombardi that Mr. Baltazar had

9  complied with all the rules, that was not a truthful

10  statement?

11             MS. BETTINELLI:  Objection.

12             THE COURT:  Excuse me.  It assumes facts not in

13  evidence.

14             Did you advise Mr. Lombardi at any time that

15  Mr. Baltazar had appeared to have complied with all of the

16  rules and regulations?

17             THE WITNESS:  No.

18  BY MR. DIAZ:

19  Q    Did Mr. Lombardi advise you that he tried to comply

20  with all the rules and regulations?

21             THE COURT:  You mean the other way around?

22             MR. DIAZ:  Yes, Your Honor.

23             MS. BETTINELLI:  Objection, Your Honor.  That

24  would be hearsay.

25             THE COURT:  I'm sorry.

1          MS. BETTINELLI:  Hearsay.

2          THE COURT:  Sustained.  And on relevance grounds

3    as well.

4    BY MR. DIAZ:

5    Q    Mr. Caruso, you have had an opportunity to work with

6    officers of what's known as ICE; correct?

7    A    Yes, sir.

8    Q    That stands for the -- what does ICE stand for?

9    A    Immigration and Customs Enforcement.

10   Q    And your department is?

11   A    Customs and Border Protection.

12   Q    Okay.  So they're both related to Customs?

13   A    Yes.

14   Q    And, in your opinion, agents of ICE have not

15   necessarily been known as being terribly truthful; correct?

16   A    I don't really understand the meaning of that question.

17   Q    You were interviewed or were present with the lady here

18   on my left, in preparation as a possible witness in this

19   case, were you not?

20   A    Yes.

21   Q    And you were being prepared to testify in this case,

22   were you not?

23   A    Yes, sir.

24   Q    And while you were having a conversation with her, you

25   told her that in your opinion ICE sometimes change things

79

1    and are not necessarily very reliable, did you not?

2    A    Something to that effect.

3            MR. DIAZ:  Nothing further, Your Honor.

4            THE COURT:  All right.  Any examination from the

5    government?

6            MS. BETTINELLI:  Yes, Your Honor.

7                        *Cross-Examination*

8    BY MS. BETTINELLI:

9    Q    Were you present on July 27th, 2007, at Amerijet when

10   defendant completed paperwork to ship a safe to Belize?

11   A    On July 27th when --

12   Q    -- 2007, were you present at Amerijet International,

13   Inc., when defendant completed paperwork to ship a safe?

14   A    No.

15   Q    Are you aware of any inaccuracy in ICE's work in this

16   case?

17   A    No.

18           MS. BETTINELLI:  No further questions, Your Honor.

19           THE COURT:  All right.  Thank you.

20           MR. DIAZ:  Nothing further, Your Honor.

21           THE COURT:  You may step down.  Thank you, sir.

22           Call your next witness.

23           MR. DIAZ:  Your Honor, the defense calls Nicole

24   Alberca to the stand.

25   ///

1      **Nicole Alberca, Defendant's Witness, Sworn**

2          THE CLERK:  Please have a seat.

3          Please state your name, spelling your last name

4      for the record.

5          THE WITNESS:  My name is Nicole Alberca, last name

6      is spelled A-l-b-e-r-c-a.

7          THE COURT:  Go ahead, counsel.

8                      *Direct Examination*

9      BY MS. BETTINELLI:

10     Q    Ms. Alberca, good morning.

11     A    Good morning, sir.

12     Q    Can you tell us if you know the gentleman right here on

13     my right.

14     A    I vaguely recognize him, yes.

15     Q    And how do you recognize him?  Who do you know him to

16     be?

17     A    I believe this is Officer Johnny Baltazar.

18     Q    Can you tell us how you are employed yourself?

19     A    I'm sorry.  Can you repeat the question.

20     Q    How are you employed yourself?  I'm sorry, I didn't --

21     A    I work for the Los Angeles Police Department.  I'm

22     currently lieutenant of police at Topanga Division.

23     Q    And back in 2007, what was your position?

24     A    I was working for internal affairs, the criminal

25     section.

1    Q    And you received a telephone call from Agent Lombardi

2    regarding Mr. Baltazar, did you not?

3              MS. BETTINELLI:  Objection, Your Honor.

4              THE COURT:  Grounds?

5              MS. BETTINELLI:  Relevance.

6              THE COURT:  It's marginal, but overruled for the

7    time being but see where it goes.

8    BY MR. DIAZ:

9    Q    You received a --

10             THE COURT:  That's a yes or no.  Did you?  Did you

11   get a call from Mr. Lombardi, Agent Lombardi?

12             THE WITNESS:  Ever, during my time working there?

13   BY MR. DIAZ:

14   Q    Did Mr. Lombardi call you about something related to

15   Officer Baltazar?

16             MS. BETTINELLI:  Objection.

17             THE COURT:  What grounds?

18             MS. BETTINELLI:  Vague as to time.

19             THE COURT:  Overruled.

20             THE WITNESS:  I have received a call from Agent

21   Lombardi, yes, sir.

22   BY MR. DIAZ:

23   Q    Did --

24             MR. DIAZ:  Just one second.

25   BY MR. DIAZ:

1  Q    -- that contact that you had with Mr. Lombardi in turn

2  trigger an investigation by your department; correct?

3           MS. BETTINELLI:  Objection.

4           THE COURT:  Ground?

5           MS. BETTINELLI:  Relevance.

6           THE COURT:  Sustained.

7  BY MR. DIAZ:

8  Q    Did you have an opportunity to interview Mr. John

9  Akopyan, in relationship to this case?

10          MS. BETTINELLI:  Objection.

11          THE COURT:  Ground?

12          MS. BETTINELLI:  Relevance.

13          THE COURT:  Overruled.

14          THE WITNESS:  Yes, sir, I did speak with

15  Mr. Akopyan -- is that correct pronunciation?

16  BY MR. DIAZ:

17  Q    And you recorded that conversation, did you not?

18  A    Yes, I believe it was recorded.

19  Q    You also spoke with Mr. Lombardi about the

20  investigation, did you not, on many occasions?

21  A    That's correct.

22  Q    You took a statement from Mr. Lombardi, did you not?

23  A    As far as did I -- I'm not really sure I understand the

24  question.

25  Q    You were preparing a report for your department, were

1    you not?

2    A    I did provide a written report for my agency, yes, sir.

3    Q    Your report included statements of whatever

4    Mr. Lombardi might have said about the case; correct?

5          MS. BETTINELLI:  Objection, Your Honor.

6          THE COURT:  That's a yes or no.  You can answer

7    that question.  Overruled.

8          THE WITNESS:  My written investigation did not

9    incorporate Agent Lombardi's statement, no.

10   BY MR. DIAZ:

11   Q    But he did provide you a statement; correct?

12   A    I believe he told me what his interview with Officer

13   Baltazar, what the contents of that conversation was, yes.

14   Q    And you yourself had an interview with Mr. Baltazar

15   regarding the same thing?

16   A    Yes, I did, sir.  There was actually two interviews

17   with Officer Baltazar.

18   Q    Now, going back to your conversation with Mr. Akopyan

19   that was recorded, you inquired of Mr. Akopyan what the

20   requirements had been -- correct? -- for shipping, that he

21   required for shipping firearms out of this country?

22         MS. BETTINELLI:  Objection, Your Honor.

23         THE COURT:  Grounds?

24         MS. BETTINELLI:  Hearsay.

25         THE COURT:  Overruled.

84

```
 1              THE WITNESS:  Sir, I did conduct that interview
 2    probably over three years ago or at least three years ago so
 3    the exact detail of that interview is -- is vague in my
 4    mind, as far as what specific details I may have asked him.
 5    BY MR. DIAZ:
 6    Q    Do you remember Mr. Akopyan informing you that he had
 7    advised Mr. Lombardi only of two requirements that were
 8    needed for bringing guns and taking them out, by his
 9    company?
10              MS. BETTINELLI:  Objection.
11              THE COURT:  Ground?
12              MS. BETTINELLI:  Hearsay.
13              THE COURT:  Prior inconsistent statement, counsel.
14              THE WITNESS:  Again, sir, I don't know the answer
15    to that.
16    BY MR. DIAZ:
17    Q    Would it reflect your recollection if you take a look
18    at the transcript of that conversation?
19    A    Absolutely.
20    Q    Let me see if I find one.
21              MS. BETTINELLI:  Your Honor, I just wanted to
22    lodge an objection with the Court regarding the method of
23    impeachment under Rule 16(b).  It's an improper method of
24    impeachment.
25              THE COURT:  Because the witness wasn't asked about
```

1   the statement?

2           MS. BETTINELLI:  That's correct, Your Honor.

3           THE COURT:  The witness is still available.  You

4   can bring him back if you wish.

5   BY MR. DIAZ:

6   Q    Can you please take a look at Exhibit 261-A.  It should

7   be before you.

8   A    Can you repeat the number, sir.

9   Q    261-A.  Could you take a minute to take a look at that

10  transcript.

11          THE COURT:  Is there any particular part that you

12  would like the witness to focus on?

13          THE WITNESS:  There's 21 pages here, sir.  It may

14  take a moment.

15          MR. DIAZ:  May I just have one moment to direct

16  the witness's attention, Your Honor --

17          THE COURT:  Yes.

18          MR. DIAZ:  -- because I think she needs to take a

19  broader look to look into the context required but --

20          THE COURT:  All right.

21  BY MR. DIAZ:

22  Q    If I can direct, I'm sorry, your attention to page

23  seven, the very last entry on page seven.

24          THE COURT:  Seven of 21?

25          MR. DIAZ:  Seven of 21, yes, Your Honor.

1        THE WITNESS:  Okay, sir.  And can you repeat the

2   question regarding my interview again.

3   BY MR. DIAZ:

4   Q    Yes.  You inquired of Mr. Akopyan what he had told

5   Mr. Lombardi; correct?

6            MS. BETTINELLI:  Objection, Your Honor.

7            THE COURT:  Ground?

8            MS. BETTINELLI:  It's hearsay.

9            THE COURT:  And any other ground?

10           MS. BETTINELLI:  And also as to -- I think it's a

11  compound question as well.

12           THE COURT:  I'm going to sustain it having now

13  looked at the document.

14  BY MR. DIAZ:

15  Q    Was the information that you obtained from Mr. Akopyan

16  somewhat consistent with the information that was included

17  in the report on Mr. Lombardi?

18  A    I didn't -- I don't understand the question because I

19  don't have Agent Lombardi's report.

20  Q    Your -- if you take a look at page seven it makes a

21  reference to what Mr. Lombardi included in that report, does

22  it not?

23  A    No, what I'm looking at is my internal affairs'

24  interview with Mr. Akopyan and what I'm asking Mr. Akopyan

25  about a shipment.

```
1              There's reference in the last question where it
2    indicates that I was aware he spoke to an Agent Lombardi in
3    October.  It doesn't incorporate anything about that
4    statement, at least on page seven that I'm looking at.
5              THE COURT:  That's correct, counsel.  So you need
6    to move on.
7    BY MR. DIAZ:
8    Q    And there was a reference -- you had seen the statement
9    from Mr. Lombardi; correct?
10   A    There's no statement in front of me from Agent
11   Lombardi.
12   Q    You don't remember seeing the report from Mr. Lombardi?
13   A    I don't have the internal affairs' investigation case
14   package in front of me; so there's a possibility that if
15   Agent Lombardi had sent that to me it could be incorporated
16   in what we refer to as rough notes.
17             However, again, it was not included in my written
18   investigation I submitted to my commanding officer.
19   Q    And is it fair to say that you have very little
20   recollection of what happened during this interview then,
21   what was said?
22   A    Well, three years later, yes, sir, that would be
23   accurate.
24             MR. DIAZ:  Nothing further, Your Honor.
25             THE COURT:  Government's examination.
```

88

| | |
|---|---|
| 1 | MS. BETTINELLI:  Nothing further, Your Honor. |
| 2 | THE COURT:  All right.  You may step down.  Thank |
| 3 | you. |
| 4 | THE WITNESS:  Yes, sir. |
| 5 | MR. DIAZ:  One moment, Your Honor. |
| 6 | THE COURT:  You may. |
| 7 | MR. DIAZ:  Your Honor, the defense recalls Alex |
| 8 | Alarcon. |
| 9 | THE COURT:  All right.  That relates to the -- |
| 10 | MR. DIAZ:  To the safe, Your Honor.  With the |
| 11 | Court's permission, I want to put it a little closer to -- I |
| 12 | don't want to be in anybody's way. |
| 13 | THE COURT:  You can move it over. |
| 14 | **Alex Alarcon, Defendant's Witness, previously sworn** |
| 15 | THE COURT:  Good morning, Mr. Alarcon. |
| 16 | THE WITNESS:  Good morning. |
| 17 | THE COURT:  You are still under oath, sir.  Okay. |
| 18 | A few more questions.  I don't think we have too |
| 19 | many, but -- |
| 20 | MR. DIAZ:  There will not be. |
| 21 | THE COURT:  Mr. Diaz. |
| 22 | *Direct Examination* |
| 23 | BY MR. DIAZ: |
| 24 | Q   Mr. Alarcon, do you recognize what's right here in |
| 25 | front of you, that safe, if you see it? |

1          THE COURT:  Parked in front of you there.

2          MR. DIAZ:  I'm sorry, Your Honor.  Probably more

3    out of the way.

4          THE COURT:  It's all right.

5          Do you see it?

6          THE WITNESS:  Yeah, I could see it.  I don't

7    remember the safe.

8    BY MR. DIAZ:

9    Q    You don't remember the safe?

10   A    No.

11   Q    You don't remember that that's the safe that you took

12   out of the car?

13   A    No.

14   Q    You don't remember --

15   A    It was a long time ago.  I do not remember.

16   Q    But you remember that it was a safe that would fit in

17   the backseat of a very small car?

18   A    I'm not -- I don't remember.  I don't remember if it's

19   big or small.

20   Q    I believe you at one time said it was a small safe.

21   A    Well, I don't know if it was -- I don't remember.  For

22   sure I don't remember.

23          MR. DIAZ:  With the Court's permission,

24   Your Honor, may I ask if he could come and see whether or

25   not he can lift that safe.

```
1              THE COURT:  No.  No.  He never said he lifted it
2    by himself.  And I don't want anybody else involved in this
3    exhibition.
4    BY MR. DIAZ:
5    Q    And your testimony, Mr. Alarcon, was that safe was
6    picked up by hand by you and Mr. Akopyan, your boss, and
7    taken to the scale?
8    A    Yes, correct.
9    Q    That much you remember about the safe?
10   A    Yes, that's all I remember.
11   Q    You don't remember whether or not there was somebody
12   else in the front of the car or not?
13   A    No.
14              MR. DIAZ:  May I have just one moment, Your Honor?
15              (Counsel conferring with his paralegal.)
16              MR. DIAZ:  Nothing further, Your Honor.
17              THE COURT:  Anything further from the government?
18              MS. BETTINELLI:  No, Your Honor.
19              THE COURT:  All right.  You may step down.  Thank
20   you, sir.
21              THE COURT:  Are we going to have foundation for
22   this item?
23              MR. DIAZ:  We are.
24              THE COURT:  You can step down.  You're done.
25              MR. DIAZ:  May I have one moment, Your Honor.
```

```
 1              THE COURT:  We ought to put an exhibit tag on it,
 2   then, shouldn't we?
 3              MR. DIAZ:  That would be a good idea.  I suggest
 4   271, Your Honor.
 5              THE COURT:  271.  I'll ask Ms. Fisher to put
 6   Exhibit 271 tag on the safe.
 7              MR. DIAZ:  Your Honor, the defense calls Kimberly
 8   Harris to the stand.
 9         Kimberly Harris, Defendant's Witness, Sworn
10              THE CLERK:  Please state your name, spelling your
11   last name for the record.
12              THE WITNESS:  My name is Kimberly Harris,
13   H-a-r-r-i-s.
14              THE COURT:  Go ahead, counsel.
15                    Direct Examination
16   BY MR. DIAZ:
17   Q    Ms. Harris, good morning.
18   A    Good morning.
19   Q    Can you first tell us how you are employed.
20   A    I'm a respiratory care practitioner.
21   Q    Where do you work?
22   A    I work at Little Company of Mary Hospital San Pedro.
23   Q    Do you know Mr. Johnny Baltazar?
24   A    Yes, I do.
25   Q    Can you tell us how you know him.
```

1    A    He's my husband.

2    Q    How long have you known him?

3    A    I've known him for six years.

4    Q    How did you meet Mr. Baltazar?

5    A    I met Mr. Baltazar while taking care of his sister

6    Pauline Baltazar Johnson.  She was one of my patients.  She

7    also went to the same church that I went to also, but she

8    was recovering from a stroke.

9    Q    Did you have an opportunity to meet Mr. Baltazar's

10   family?

11   A    Yes, I met his mother, her -- Ms. Pauline Johnson's two

12   daughters Paula and Ladana and some other persons in the

13   family during Pauline's -- she had a lengthy stay in the

14   hospital.

15   Q    When you met Mr. Baltazar, did you know that there was

16   a connection between him and the country of Belize?

17   A    Yes.

18   Q    Before you met Mr. Baltazar, had you ever been to

19   Belize?

20   A    No, I haven't.

21   Q    Have you been to Belize after you met Mr. Baltazar?

22   A    Yes, I have.

23   Q    Does the -- how many times have you been to Belize?

24   A    I've been to Belize three times.

25   Q    And how frequently does your husband travel to Belize,

1   if you know.

2   A    Well, he just recently went to Belize for family

3   reunion, with his family, and he goes every now and then

4   that he travels.

5   Q    Do you know what Elite Security is?

6   A    Elite Security is the family business in Belize.

7   Q    And what type of business is it, if you know?

8   A    The business is a security business.  They provide home

9   security, and also they provide security guards.

10  Q    When you travel to Belize, did you have an opportunity

11  to ascertain whether or not it was a real company?

12  A    Yes, I have.  When I went there, I went to Elite

13  Security located in Belmopan, Belize, and I met several

14  employees, and I also met several of his customers.

15          Upon arriving to Belize, you do see his security

16  guards at the airport.

17          So his security guards do work at the airport in

18  Belize.

19          MS. BETTINELLI:  Your Honor, objection.  Move to

20  strike the answer to the question.  It's nonresponsive.

21          THE COURT:  Not timely, counsel.  Overruled.

22  BY MR. DIAZ:

23  Q    Did you ever have an opportunity to assist your husband

24  in making any shipments to Belize?

25  A    Yes, I have.

1  Q    Approximately how many times have you helped him make

2  shipments to Belize?

3  A    A few -- a few times.  I can't say exact number, but a

4  few times.

5  Q    Can you briefly describe what kind of items have been

6  shipped to Belize?

7  A    Yes.  On occasion, we have shipped office supplies --

8  pens, paper, uniforms, shoes, the belt, the uniforms that

9  the security guards wear in Belize; and at one time, a van

10  we shipped to Belize.  We drove it, though.  We drove it

11  from California to Florida, and he had his personal van and

12  his personal boat that we took -- we drove to Florida.

13  Q    Now, I'm going to ask you some questions about an item

14  that is right in front of you.  It's called -- it's a safe

15  and ask you -- tell me if you recognize it.

16  A    Yes, I do.

17  Q    Do you know where this -- if this safe was purchased by

18  either you or by Mr. Baltazar?

19  A    Yes, I was with Mr. Baltazar when he purchased that

20  safe.  That safe was purchased in Van Nuys, but I don't

21  know -- I don't remember the name of the company but, yes, I

22  was with him when he purchased it.

23  Q    Do you remember how you transported that safe from the

24  place where you bought it to where ever it was going?

25  A    Yes, it was transported in my black BMW.

1  Q    And was there a reason why it was not transported in

2  Mr. Baltazar's car?

3  A    Yes, I have a SUV.  I have an X3 BMW.  The hatchback

4  opens.  That safe fits nice and neatly in the back of my

5  truck or an SUV.

6  Q    Would that safe fit into Mr. Baltazar's car?

7  A    With great -- it will be very difficult.

8  Q    Now, did you note that Mr. Baltazar was contemplating

9  retirement from the force?

10 A    Yes.

11 Q    Did you know that he was contemplating retiring to

12 Belize, so to speak?

13 A    Yes.

14 Q    Did you have an opportunity to be with Mr. Baltazar

15 when he purchased guns that were intended to be shipped to

16 Belize?

17 A    Yes, I was with him.

18 Q    Can you tell us about where that purchase took place.

19 A    The guns were purchased at the police academy.

20 Q    And did you know anything about ammunition that was

21 purchased also?

22 A    Yes, I was with him when he purchased the ammunition

23 also.

24 Q    And was it your understanding that the guns and the

25 ammunition were going to be shipped out of the country?

1  A    Yes.

2  Q    Were they going to be shipped in the safe?

3  A    Yes, they were.

4  Q    Now, did you have -- did you undertake any activity to

5  ascertain the requirements for taking guns to Belize?

6  A    Yes, my husband and I, we both looked up the guidelines

7  on how to ship guns, well, firearms, out of the country.  We

8  did look it up.

9  Q    Do you remember if you spoke with any airlines on that

10  regard?

11  A    Yes, I did.  I spoke with American Airlines; and when I

12  spoke with them, they gave me their guidelines on how to

13  transport firearms.

14  Q    And what guidelines were you told were needed?  What

15  was needed?

16  A    The person from the airlines, they told me that the

17  guns -- a gun, if you are to take on the airline, a gun must

18  be in a hard side container.  And in that hard-side

19  container also you can have the ammunition in that

20  container.  It must be under lock, and it must be -- or it

21  could have a combination -- and the key is to remain with

22  the person, and the guns must be orally declared.

23  Q    When you say "orally declared," are you referring to

24  information that you obtained from the Internet?

25  A    I found that on the Internet also, but the person I

1  spoke to over the phone, the agent, said that you must

2  orally declare it to -- once you reach the agent -- well,

3  when you get to the airport, the --

4  Q    And was that information consistent with the

5  information that you yourself obtained from the Internet?

6  A    That's the exact same information and guidelines that

7  are supposed to be -- those are the same guidelines that TSA

8  has.

9  Q    Can you please take a look at Exhibit 251.

10 A    Yes, I see it.

11 Q    Is this some more information that you helped Mr.

12 Baltazar obtain?

13 A    Yes, this is the information that I obtained from the

14 Internet concerning the guidelines on how to transport

15 firearms.

16 Q    Did you find that it was easy or difficult to find out

17 what the requirements and regulations were?

18 A    It was difficult.

19 Q    And you were assisting Mr. Baltazar in this endeavor?

20 A    Yes.

21 Q    Were you present when this safe was packed with guns

22 and ammunition?

23 A    Yes, I was.

24 Q    Was it done as securely as it could be done?

25 A    Yes.

1   Q    Now, I'm going to ask you about the delivery of this

2   safe to -- do you know where it was delivered to?

3   A    Amerijet.

4   Q    Ms. Harris, I'm going to put on a pictue here of

5   Exhibit 1.  Do you recognize this as the Amerijet

6   facilities?

7   A    Yes, I do.

8   Q    Let me first ask you.  How did the -- how did the

9   safe -- who took the safe to Amerijet?

10  A    My husband and I.

11  Q    How was the safe transported?

12  A    The safe was transported in my black BMW because of the

13  ease of access of getting the safe in my truck.  I have a

14  hatchback, and we were able to -- well, he was able to get

15  it right in because he had like a jack or dolly-type device

16  to lift it, and it was able to go very easily in the back of

17  my car.

18  Q    Was your vehicle used because it was just easy to get

19  in and out with it?

20  A    Yes.

21  Q    Now, what time was it when you two arrived at Amerijet?

22  A    It was in afternoon, late afternoon.

23  Q    Do you remember what was happening at Amerijet at that

24  point?  Was it busy?  Was the place busy?

25  A    They were getting ready to close, and at the time there

1   was like a semi trailer, and there were two gentlemen

2   loading up the trailer.

3          So there was a guy with a fork truck -- a forklift

4   and another guy putting packages from the forklift into the

5   tractor of the truck.

6   Q    Did it appear like they were hurrying up and trying to

7   do things fast?

8   A    Yeah.

9   Q    Taking a look at what's on the screen, tell us as far

10  as you can where you remember your car being parked.  And

11  where was the semi that you identified?

12  A    You want me to point on --

13  Q    Just tell us where in relationship to the vehicles

14  there.

15  A    Okay.  Where that black truck is, my car was a little

16  bit -- front-end right here (indicating).

17  Q    And --

18  A    And then the semi trailer -- if you don't mind me

19  standing up -- was right here (indicating).

20  Q    And how did the safe make it out of your car into

21  Amerijet?

22  A    The persons that -- the person that was driving the

23  forklift, he came around, opened my -- well, I had to lift

24  the liftgate because I got off the car to help lift the

25  liftgate, and he had the -- he and this other person, they

```
 1   put it on the forklift right from my truck because the
 2   forklift went level.  You know how it goes up, it was level
 3   to the lift of my car, the back end of my car, and they
 4   pushed the safe easily, pushed it right on, and then it came
 5   down.  And then they took it inside, inside that area.
 6   Q    Now --
 7             MR. DIAZ:  May I have one moment, Your Honor?
 8             THE COURT:  Yes.
 9             (Counsel conferring with his paralegal.)
10   BY MR. DIAZ:
11   Q    Did you have an opportunity to try to load that safe up
12   again in your car this morning?
13   A    There's no way possible can I pick that safe up.
14   Q    But you remember it was put in your car.  I'm sorry.
15   Not yourself but somebody else put it in your car?
16   A    Yes, I saw it being put in my car.
17   Q    And were pictures being taken of what was being done
18   this morning of that car?
19   A    Yes.
20             MR. DIAZ:  May I, Your Honor, show these pictures
21   to the witness that were taken while she was there?
22             THE COURT:  Has the government seen them?
23             MS. BETTINELLI:  Yes, Your Honor.
24             THE COURT:  All right.  Go ahead.
25             Do you have a set for the court?
```

1          MR. DIAZ:  I will have, Your Honor.  We are

2    collating them, and they're not really numbered; so I --

3          If I may remain here one moment.

4    BY MR. DIAZ:

5    Q    Can you tell us if you recognize those.

6    A    Yes, I do.

7    Q    Briefly glance at all of them so I can take them back.

8    A    Okay.  That's the back end with the safe.

9    Q    No, that's okay.

10   A    I'm so sorry.

11         This is my BMW --

12   Q    Just tell us if you recognize them all, and then I'll

13   take them back.

14   A    Okay.  Yes, I do.

15         Do you want me to look at these?

16   Q    Do you still have the same car that you transported the

17   safe in back then?

18   A    Yes.

19   Q    And Mr. Baltazar still has the same car that he had

20   back then?

21   A    Yes.

22   Q    And the pictures that you saw today depict how the cars

23   look now?

24   A    Yes.

25   Q    Do they look any different from what they looked back

1    in 2007?

2    A    No.

3    Q    Does the safe look any different than from what it

4    looked in 2007?

5    A    No.

6    Q    Where was the safe kept between the time it was

7    returned from Belize and last night?

8    A    In storage.

9              MR. DIAZ:  Your Honor, I'm going to identify these

10   pictures as Exhibit 272 and request permission to admit them

11   in.

12             THE COURT:  All right.  Is there any objection

13   from the government?

14             MS. BETTINELLI:  No objection, Your Honor.

15             THE COURT:  All right.  They're received.

16             (Defendant's Exhibit 272 received.)

17   BY MR. DIAZ:

18   Q    Ms. Harris, I want to show you a picture of which --

19   well, tell me if you recognize what it is.

20   A    That's my black truck BMW, SUV.

21   Q    And that was the vehicle that was used to have the safe

22   transported?

23   A    Yes, it was.

24   Q    And it would fit more or less like that?

25   A    Yes.

1  Q    Is that how it was transported to Amerijet?

2  A    Yes.

3  Q    Is it your testimony that the forklift came in and

4  lifted it out of there?

5  A    Yes, it did.

6  Q    Do you know what happened to the safe after it was

7  picked up by Amerijet?

8  A    They took it inside to be weighed.

9  Q    And your testimony was -- do you recognize this car?

10 A    Yes, that's my husband's green Mercedes Benz.

11 Q    And you said the safe would not fit into this car,

12 that's why your vehicle was used --

13 A    No, I didn't say it did not fit in the car, I said it

14 was difficult for it to fit into the car.

15 Q    I'm sorry.  And the decision was made to use your BMW?

16 A    Right.  Because it's more -- can I -- is it okay if I

17 explain why?

18         Because when you lift up the liftgate, the safe is

19 easily able to go right in.  In order for it to go into

20 the -- into the Mercedes -- it's very cumbersome and there's

21 no way possible me and my husband can pick up that safe or I

22 to pick up that safe to put it in the backseat of a car.

23 It's too cumbersome.

24 Q    Now, the -- when you -- do you know what Mr. Baltazar,

25 your husband, did when he delivered this safe to Amerijet?

```
1    A    Okay, I was inside the car, and he went inside
2    Amerijet.
3    Q    And do you remember what he spoke to with any of the
4    people there?  Did you have an opportunity to hear?
5              MS. BETTINELLI:  Objection, Your Honor.
6              THE COURT:  Foundation.
7              MS. BETTINELLI:  Hearsay.
8              THE COURT:  Well, first of all, there's a
9    foundational question.
10             Were you within hearing distance of your husband
11   and persons at Amerijet when they were having whatever
12   conversations they may have been having?
13             THE WITNESS:  I was not there.  I just saw who he
14   was talking with, but I was not in --
15             THE COURT:  So you could visually see them
16   talking, but you could not hear what was being said?
17             THE WITNESS:  Correct.
18   BY MR. DIAZ:
19   Q    The -- did you get the impression that you were
20   breaking the law when you were delivering this safe?
21   A    No.
22   Q    Did you get the impression that you were engaging or
23   participating in any sort of illegitimate business?
24   A    No, we were following the TSA guidelines.
25   Q    Now, were you aware of the fact that that safe was
```

1  returned?

2  A    Yes, I am aware of that.

3  Q    And did you -- were you involved in providing

4  information to the federal agents regarding the contents of

5  that safe?

6  A    Yes.

7  Q    Did you have interviews with the agents in that regard?

8  A    Yes, I went with my husband to meet with Agent

9  Lombardi.

10 Q    Were you present when the questions were asked?

11 A    Yes, I was.

12 Q    Were you in any way tempted to say something that was

13 not true?

14 A    No, I did not.

15 Q    Do you know if your husband said anything that was not

16 true at that time?

17         MS. BETTINELLI:  Objection.

18         THE COURT:  Sustained.

19 BY MR. DIAZ:

20 Q    The conversation with Mr. Lombardi, was that a friendly

21 conversation?

22 A    Yes, it was.

23 Q    Now, you said that you, your husband, provided receipts

24 of everything that had been done?

25 A    Yes, he did.

```
1   Q    And did you also provide Mr. Lombardi with the

2   information as to your efforts to ascertain the procedures

3   to ship guns?

4   A    Right.  I also told him that I found how I obtained the

5   information to ship the guns, how to ship firearms.

6   Q    Did -- was your impression that you were going to

7   obtain the guns and its contents back after you spoke with

8   Mr. Lombardi and everybody else?

9   A    Yes, I did.

10  Q    And did you learn that the guns were not going to be

11  returned after all?

12  A    Well, after a period of time, yes, because after the

13  conversation with Lombardi, it was a friendly conversation

14  and so it seemed like he was just trying to clear up, to

15  clarify so -- the reason why we were transporting the guns

16  and if the business was a legitimate business, which we

17  provided him the information on Elite Security.

18          And afterwards, I had went to Long Beach to the

19  Custom --

20          MS. BETTINELLI:  Objection, Your Honor.

21  Narrative.

22          THE COURT:  Sustained.

23  BY MR. DIAZ:

24  Q    You went -- what was the purpose of your trip to

25  Customs?
```

```
 1   A     To obtain the safe.

 2   Q     And were you able to obtain the safe?

 3   A     No.

 4   Q     Take a look at Exhibit 204.  Can you tell us if you

 5   recognize the document on Exhibit 204.

 6   A     Yes.

 7   Q     Can you tell us if you recognize the handwriting on the

 8   upper right-hand corner of Exhibit 204?

 9   A     Yes.

10   Q     Whose handwriting is that?

11   A     That's my handwriting.

12   Q     Is that a document that you sent to Mr. Lombardi

13   regarding the items that were inside the safe?

14   A     Right, yes.

15         MR. DIAZ:  Your Honor, may I move 204 into

16   evidence?

17         THE COURT:  Any objection to 204?

18         MS. BETTINELLI:  No objection.

19         THE COURT:  It's received.

20            (Defendant's Exhibit 204 received.)

21   BY MR. DIAZ:

22   Q     Now, please take a look at Exhibit 237.

23   A     Yes.

24   Q     Do you recognize Exhibit 207?  I'm sorry, 237.

25   A     237, the exhibit, yes, I do recognize it.
```

1   Q     Can you tell us what that is.

2   A     That is a letter that I drafted for my husband to have

3   his guns released and the safe released.

4   Q     Did you say you drafted this letter?

5   A     Yes, I did.  I drafted it for him.

6   Q     For his -- are you the better writer?

7   A     Yes, I am.

8   Q     But that's his signature?

9   A     That's definitely his signature.

10  Q     And what if anything did you do with this letter?

11  A     This letter -- this letter was given to Customs.

12  Q     Was this -- do you remember how it was given?  Was it

13  given by Mr. Baltazar?  By yourself?

14  A     I can't remember.  I'm sorry.

15  Q     And do you know if the guns were not received after you

16  sent this letter; correct?

17  A     No, it wasn't.

18          MR. DIAZ:  Your Honor, may I move 237 into

19  evidence?

20          THE COURT:  Any objection to 237?

21          MS. BETTINELLI:  Your Honor, objection.  Hearsay.

22          THE COURT:  I will sustain it at this point.

23          Mr. Diaz, I think that there are portions of it

24  which may be admissible, but there are also hearsay

25  portions.

1          So unless and until there's some redactions made

2    of the hearsay material, the objection will remain

3    sustained.

4          MR. DIAZ:  Very well, Your Honor.

5    BY MR. DIAZ:

6    Q    After you and your husband met with Mr. Lombardi, did

7    you two keep in contact with him providing him additional

8    information?

9    A    I didn't provide him any information.  My husband could

10   have.

11   Q    When was the next time you saw Mr. Lombardi?

12   A    The next time I saw Mr. Lombardi was on my anniversary

13   cruise.  My husband and I, we went on a cruise to Mexico,

14   and we were detained at the end of the --

15         MS. BETTINELLI:  Objection.  Narrative.

16         THE COURT:  All right.  It is beyond the scope of

17   the question.

18         So it was on the anniversary cruise; so that

19   answer and the rest of it is stricken.

20   BY MR. DIAZ:

21   Q    And did Mr. Lombardi again proceeded to ask either your

22   husband or yourself any questions regarding guns?

23   A    Yes.

24   Q    What did Mr. Lombardi ask you?

25         MS. BETTINELLI:  Objection.

```
 1              THE COURT:  What's your ground?

 2              MS. BETTINELLI:  Hearsay.  You have to find out

 3   who the speaker --

 4              THE COURT:  The question is not hearsay.

 5   Overruled.

 6              What questions did Lombardi ask?

 7              THE WITNESS:  Lombardi asked us why we were on our

 8   cruise.  Did we purchase any weapons.  Did we have any

 9   weapons.

10   BY MR. DIAZ:

11   Q    Was his tone of voice friendly?

12   A    He was very hostile.

13   Q    Did you find that either your husband or yourself had

14   anything illegal or improper in your possession or your

15   luggage?

16              MS. BETTINELLI:  Objection.

17              THE COURT:  Grounds.

18              MS. BETTINELLI:  Relevance.

19              THE COURT:  Sustained.

20   BY MR. DIAZ:

21   Q    Ms. Harris, are you -- part of your job, are you used

22   to follow rules and procedures?

23   A    As a respiratory care practitioner, I do have to follow

24   rules and procedures especially rules and procedures

25   concerning isolation precaution.  Different precautions for
```

1    my patients.

2              MS. BETTINELLI:  Objection.

3    BY MR. DIAZ:

4    Q    And do you feel that you follow rules and procedures in

5    this case related to the safe and its contents?

6    A    Yes, I did.

7              MR. DIAZ:  Nothing further, Your Honor.

8              THE COURT:  All right.  Any examination?

9              MS. BETTINELLI:  Yes, Your Honor.

10                       *Cross-Examination*

11   BY MS. BETTINELLI:

12   Q    Were you present on July 27th, 2007, in the office of

13   Amerijet?

14   A    Was I present in the office of Amerijet, 2007?  Can you

15   ask me more because I can't remember the date.

16   Q    Well, where were you on the date when the safe was

17   delivered?  Where were you located at the Amerijet facility?

18   A    I was in my car.

19   Q    At any point in time, did you go into the office at

20   Amerijet?

21   A    No, I didn't.

22   Q    Did you see your husband complete the paperwork for any

23   of the shipping documents for the safe?

24   A    I saw him and -- I was able to see inside Amerijet, and

25   I did see him with a female and paperwork.

```
1    Q     Being completed?

2    A     Yeah, they were discussing paperwork.  I don't -- I

3    can't -- I wasn't -- couldn't hear what they were saying.

4    Q     So your testimony is you didn't see nor did you hear

5    anything with respect to the completion of the paperwork for

6    the shipping documentation?

7    A     I did not say I didn't see.  I said I didn't hear.

8    Q     You did not hear, but you were not physically present

9    in the office when the documents were completed; is that

10   correct?

11   A     You would have to rephrase your question because I

12   can't say that's correct.

13            THE COURT:  I thought you said you were in the

14   car?

15            THE WITNESS:  I was in the car, but I could see

16   the lady with the papers.

17            THE COURT:  Okay.

18            All right.  Counsel.

19            MS. BETTINELLI:  Nothing further, Your Honor.

20            THE COURT:  All right.  Anything further?

21            MR. DIAZ:  Nothing further, Your Honor.

22            THE COURT:  All right.  You may step down.  Thank

23   you.

24            MR. DIAZ:  May I have one moment, Your Honor?

25            THE COURT:  Yes.
```

1          (Brief pause in the proceedings.)

2          MR. DIAZ:  Your Honor, the defense calls Desmond

3    Morris to the stand.

4          THE COURT:  All right.  If you're going to -- I

5    didn't know you were going to call more witnesses.

6          MR. DIAZ:  I'm sorry, Your Honor.

7          THE COURT:  I think we'll take a recess at this

8    point.

9          We'll be in recess 20, 25 minutes before we

10   resume.

11         Ladies and gentlemen, during the course of the

12   recess, you should not discuss the case between or amongst

13   yourselves or with any other person, or form or express any

14   opinions on the matters pending before this court.

15         In recess.

16   *(Recess taken at 12:03 p.m.; further proceedings of this day*

17                 *not contained herein.)*

18

19                      *-oOo-*

20

21

22

23

24

25

1

2

3

4

5                            *CERTIFICATE*

6

7              *I hereby certify that pursuant to Section 753,*

8    *Title 28, United States Code, the foregoing is a true and*

9    *correct transcript of the stenographically reported*

10   *proceedings held in the above-entitled matter and that the*

11   *transcript format is in conformance with the regulations of*

12   *the Judicial Conference of the United States.*

13

14   *Date:   June 23, 2011*

15

16

17

18                    /s/_____
                      *Lisa M. Gonzalez, U.S. Court Reporter*
19                    *CSR No. 5920*

20

21

22

23

24

25